1          UNITED STATES BANKRUPTCY COURT

2             DISTRICT OF DELAWARE

3   . . . . . . . . . . . . .
                            :
4   In re:                  :
                            :  Chapter 11
5   SPORTSMAN'S WAREHOUSE,   :
    INC., et al.,           :  Case No. 09-10990 (CSS)
6                           :
                            :  Jointly Administered
7                           :
        Debtors.            :
8   . . . . . . . . . . . . .

9                     Wilmington, Delaware
                      March 23, 2009
10                      2:00 PM

11                  TRANSCRIPT OF HEARING
           BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
12              UNITED STATES BANKRUPTCY JUDGE

13  APPEARANCES:

14  For the Debtors:        Gregg M. Galardi, Esq.
                            Glenn S. Walter, Esq.
15                          Emily C. Ma, Esq.
                            Skadden Arps Slate Meagher
16                          & Flom, LLP

17  For GB Merchant
    Partners, LLC:          Peter Antoszyk, Esq.
18                          Gary Creem, Esq.
                            Proskauer Rose, LLP
19
                            Steven K. Kortanek, Esq.
20                          Womble Carlyle Sandridge & Rice

21                          David Neier, Esq.
                            Winston & Strawn LLP
22
                            Kurt Gwynne, Esq.
23                          Reed Smith LLP

24

25

```
 1   For Hawkins Companies,
     Developer Diversified
 2   Realty, Weingarten
     Realty Investors:          Gilbert R. Saydah, Jr., Esq.
 3                              Kelley Drye & Warren LLP

 4   For Inland Southwest
     Management:                Christina Thompson, Esq.
 5
     For Seidler:               Mark Collins, Esq.
 6                              Richards Layton & Finger

 7   For U.S. Trustee:          David Klauder, Esq.
                                Office of U.S. Trustee
 8
     Audio Operator:            Jennifer Pasierb
 9
     Transcribing Firm:         Perfect Pages Transcription, Inc.
10                              18 Tuckerton Road
                                Shamong, NJ 08088
11                              (609) 654-8880

12

13   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.
14

15

16

17

18

19

20

21

22

23

24

25
```

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

INDEX

|  | Direct | Cross | Re-Direct | Re-Cross | Further Redirect |
|---|---|---|---|---|---|
| Witness For Debtors: | | | | | |
| Mark Weinsten | | | | | |
| (by Gregg Galardi) | 30 | | 59 | | |
| (by David Klauder) | | 65 | | | |

1          THE COURT:  Please be seated.

2          MR. GALARDI:  Good afternoon, Your Honor.  For the

3   record, Gregg Galardi as proposed counsel to Sportsman's

4   Warehouse, Inc., Debtors.  To my right are Ms. Emily Ma and

5   Ms. Kristhy Peguero *(ph)*.  Glenn Walter will be coming in at a

6   certain point.  We're going to move their admission, Ms. Ma

7   and Ms. (*sic*) Walter from California, pro hac vice.

8          THE COURT:  All right.

9          MR. GALARDI:  In addition, Your Honor, behind me we

10  have counsel from Goulston & Storrs, Mr. James Wallack, who

11  for today's hearing if he has to make an appearance, I'll move

12  him pro hac vice.  He's a member in good standing in the

13  Massachusetts Bar and has appeared before this Court before.

14         THE COURT:  Very good.  Welcome.

15         MR. WALLACK:  Thank you.

16         MR. GALARDI:  Your Honor, also in the courtroom,

17  just by way of introductions, to my right is Mr. Rourk Kemp,

18  who is the Chief Financial Officer of Sportsman's Warehouse

19  and the declarant whose declaration was filed in support of

20  the First-Day papers, and to his right and to the far right

21  are Mr. Jonathan Nyswander (*ph*) of FTI and Mr. Mark Weinsten

22  of FTI.  Mr. Weinsten will be one of the witnesses today to

23  the extent of testimony or proffer in support of the First-Day

24  papers.

25         THE COURT:  All right.  Very good.  Welcome.

1      MR. GALARDI:  Your Honor, for -- I don't know if

2 other counsel would now like to do up the pro hac vices before

3 we get started or however Your Honor wants to proceed.

4      THE COURT:  Does anyone wish to be heard?

5      MR. GWYNNE:  Good afternoon, Your Honor.  Kurt

6 Gwynne from Reed Smith on behalf of GECC.  We'd like to move

7 the admission pro hac vice of David Neier, who is a member in

8 good standing of the Bar of Illinois.

9      MR. NEIER:  No.  New York.

10      MR. GWYNNE:  New York.

11      MR. NEIER:  Good afternoon, Your Honor.

12      MR. GWYNNE:  New York.

13      THE COURT:  Good afternoon, Mr. Neier.  It's nice to

14 see you again.

15      MR. GWYNNE:  New York, a suburb of Illinois.

16      THE COURT:  When I worked with Mr. Neier, I never

17 made that mistake, Mr. Gwynne.

18      MR. KORTANEK:  Good afternoon, Your Honor.  Steve

19 Kortanek of Womble Carlyle.

20      THE COURT:  Good afternoon.

21      MR. KORTANEK:  We represent GB Merchant Partners

22 LLC, which is the agent for the second lien lenders.  With me

23 today is Peter Antoszyk and his partner Gary Creem, who are

24 with the Proskauer firm and will file pro hac papers.  If they

25 could be heard today, we'd appreciate it, Your Honor.

1     THE COURT:  Very good.  Yes, of course.  Welcome.

2     MR. KORTANEK:  Thank you, Your Honor.

3     THE COURT:  All right.  Let's go.

4     MR. GALARDI:  Your Honor, what's been my practice,

5 if I might come up to Your Honor and hand up a proposed DIP

6 budget, because I think that will help form the relief that

7 we're going to go through and also the background for these

8 cases.  If I may hand it up.

9     THE COURT:  Very good.  Yes.  Thank you.

10     MR. GALARDI:  Just by way of brief introduction,

11 Your Honor, Sportsman's Warehouse currently is the operator of

12 52 retail stores located primarily in the west coast.  As of

13 March 1st of this year, it had an additional 15 stores that

14 were set forth in the declaration sold to a Canadian

15 cooperative called UFA Co-op, which purchased 15 of the 67

16 stores, leaving the balance of 52 that I mentioned.  I think

17 it was probably a week ago Monday, if I'm not mistaken, that

18 they actually closed on a transaction, or Tuesday, by which

19 they purchased 15 of our stores.  In connection with that and

20 prior to the filing, they had approximately $30 million of

21 secured debt, secured primarily by fixtures in those stores.

22 They closed on those stores and in connection with that

23 closing also paid 93 cents on the dollar with respect to cost

24 of the inventory in those stores.

25  Then we have, Your Honor, as Your Honor's read the

1  papers, in addition as part of the restructuring efforts, we

2  have been -- we started sale closings at 23 of the 52 stores,

3  for which Your Honor knows later on we'd be seeking authority

4  to assume the agency agreement.  Your Honor, as we sit here

5  today, there's approximately $30 million or $28 million of

6  secured debt on this company that is secured.  I think 16 of

7  it is the Gordon Brothers debt and the balance being GE debt.

8  In addition, Your Honor, as we sit here today or stand here

9  today, there is unsecured debt that roughly breaks out as

10  follows:  $80 million of trade debt, $5 million note from UFA,

11  there are leases that we are seeking to reject and then there

12  will be the 23 leases ultimately that will either be rejected

13  or assumed.  So roughly $6 million to $10 million of lease

14  claims, $5 million to $10 million of other unsecured claims.

15      In addition, Your Honor -- and Mr. Colombs (*ph*) is also

16  in the courtroom today -- there is a significant debt holder

17  at the holding company called Seidler.  Seidler presently is

18  owed $25 million under a note plus some interest that may be

19  accrued as of the petition date.  In addition, it had $50

20  million of preferred stock, which Seidler contends has been

21  converted into a debt claim at this point in time by way of an

22  acceleration and an event in January of '09.  We have not made

23  a determination whether it's debt or equity or preferred

24  equity.  That being said, Your Honor, I think largely it will

25  make no difference with respect to the outcome of this case

1  because of the structure between Holdings and Sportsman's

2  Warehouse, Inc.

3  Your Honor, we find ourselves today seeking to begin a

4  process that we hope to exit -- and I know this word will come

5  out a few times in this case -- to make a quick restructuring

6  and exit bankruptcy as a going concern and not to, you know,

7  follow the plight of Goody's going in again.  Your Honor, very

8  quickly, we believe that the 29-store chain and maybe a subset

9  of that, if we were to get rid of certain other stores, is a

10  good viable business.  It has EBITDA somewhere between $20

11  million and $30 million a year of positive EBITDA.  And

12  essentially what the company finds itself and why it commenced

13  these cases, as set forth in Mr. Kemp's declaration, is to

14  restructure these cases, find some extra liquidity through

15  someone to finance a plan of reorganization and exit these

16  cases within 120 days.  The hope is to file a plan and

17  disclosure statement in the first 30 to 40 days, to

18  restructure the unsecured debt, which I set forth, to repay or

19  refinance out the secured debt and to have a viable 29-store

20  chain or some subset of that chain emerge from this

21  bankruptcy.  Your Honor, with that, what I'd like to do is to

22  turn to the agenda unless you're your Honor has questions.

23  THE COURT:  No.

24  MR. GALARDI:  Your Honor, going through the Motions,

25  the first Motion, and again, depending upon how Your Honor

1   wants to proceed, the very first Motion is the requirement to

2   basically have -- waiving the requirements with respect to

3   notice.  We have a joint administration Motion, Your Honor,

4   that I haven't put on the agenda.  Your Honor, there are six

5   Debtors.  They're all affiliated --

6           THE COURT:  Let me just interrupt --

7           MR. GALARDI:  Sure.

8           THE COURT:  -- if I may.  I've read all the Motions.

9   I think they're pretty standard.  So as we go through them, I

10  don't think you need to describe them.  All I want to hear

11  about are any changes or any objections.

12          MR. GALARDI:  Sure.  Sure.  Your Honor, with respect

13  to what's on number 2, there are no objections to number 2.

14  There are no objections to number 3, which is the application

15  to retain Kurtzman Carson.  With respect to the authorizing

16  the use of cash management, the U.S. Trustee had certain

17  concerns and I think we've addressed those concerns.  Briefly,

18  those concerns were the U.S. Trustee had raised an objection

19  not to give superpriority status with respect to intercompany

20  claims.  We've agreed that they will just be ordinary

21  administrative claims without superpriority status.

22      In addition, and this sort of blends into number 5 on my

23  agenda, which is the waiving of the investment guidelines,

24  there were three accounts that the U.S. Trustee had a concern

25  with.  One was a $50,000 account with Heritage Bank.  That is,

1   there's $50,000 in it.  It was a business decision to open up

2   that account with Heritage Bank.  It is insured, so I think

3   for the interim purposes he has no longer any issues with

4   that.  The next is $100,000 CD in First Utah.  That is

5   security for a capital lease.  Again, it's fully secured by

6   FDIC insurance.  Since we're only under 5 seeking an interim

7   approval, I don't think there's any concern with that.  The

8   final one, there was a million dollars in Health U.S. Bank.

9   He is concerned about that, especially with respect to 345(b).

10  What we've agreed is that there would be an interim 345(b)

11  waiver and work with him with respect to the collateralization

12  of that.

13      In addition, Your Honor, there was a concern about

14  sending a letter to the banks that have the accounts saying

15  that we're debtors-in-possession and that they take

16  appropriate steps in that regard.  As I noted, the collection

17  accounts are really not our accounts because this is a term

18  loan that turned.  So that wasn't the issue but we've agreed

19  with the U.S. Trustee to send a letter to those accounts from

20  which we -- we send money out to the disbursing accounts to

21  give that same thing, to say we are -- we are, in fact, a

22  debtor-in-possession and that you should be noted on that and

23  whatever else the U.S. Trustee has requested.  With respect to

24  that, I believe those resolved the U.S. Trustee's concerns on

25  both, I will say, the existing bank accounts as well as number

1  5, the interim order with respect to 345(b) relief.

2  THE COURT: Mr. Klauder, good morning. Good

3  afternoon.

4  MR. KLAUDER: Dave Klauder for United States

5  Trustee's Office. That is correct. We're satisfied at this

6  point and the interim waiver is acceptable and we'll work on

7  the issues Mr. Galardi noted.

8  THE COURT: Okay.

9  MR. GALARDI: Your Honor, that then brings us to

10  item number 6, which is the Motion to pay wages, compensation

11  and employee benefits. Again, we had -- we've talked to the

12  U.S. Trustee about this Motion. We have made a revised order.

13  Your Honor, do you want the revised orders now or at the

14  conclusion of the hearing? How would you like to proceed?

15  THE COURT: I generally like to see them as we go

16  but let's finish this one and you can hand up the ones we've

17  gone through.

18  MR. GALARDI: Okay. With respect to -- and I don't

19  think we made any changes to those first 4 or 5. I think this

20  is the one that actually had a language change. The rest were

21  representations that I would make on the record with respect

22  to the cash management. That's in the wage one. We did

23  change the cash management. I'm sorry. We did strike the

24  language on the not being a superpriority. So I will have a

25  change to that order. I forgot. You're correct.

1    With respect to the wage order, the U.S. Trustee had
2  requested a couple things.  The first was to make sure that
3  none of the payments under this order -- and we have made this
4  -- we make this representation and it's included in the order
5  -- that none of the individuals getting these payments are
6  over the priority amount set forth.  Second, Your Honor, we
7  make the representation to the best of our knowledge, there is
8  none of the health benefits or any of the benefits of
9  compensation plans getting over the 507(a)(5) hurdle.  And, in
10  addition, Your Honor, we've put a clawback, if somehow
11  accidently that happens, we can claw it back as a postpetition
12  transfer under 549.
13    Your Honor, the other concern that the U.S. Trustee had
14  was some sort of cap on business expenses.  As we explained to
15  the U.S. Trustee, the reimbursement of business expenses, our
16  average monthly came out to roughly $34,000 a month.  However,
17  in months where we close stores or open stores, they can be as
18  high and have been as high as $45,000.  What we have done is
19  put in the employee order that we are limited to
20  reimbursements up to $40,000 of prepetition business expenses
21  and in the event that we should have to exceed that, we'll
22  come back to the Court for further relief.  Those changes are
23  in the First-Day
24  -- in the order with respect to wages and salaries.  There
25  were no other change -- one other change.  There was a

1  longevity bonus program in the -- mentioned in the First-Day

2  Motion and we have taken that out.  Nothing in here is

3  intended to allow us to pay those bonuses and it says in the

4  order now that it would be subject to a separate Motion and

5  order.  I think those address the U.S. Trustee's concerns and

6  I can hand up those forms of order.

7          THE COURT:  While you do that, does anyone wish to

8  be heard?

9          MR. KLAUDER:  That does address our concerns, Your

10  Honor.

11          THE COURT:  Very good.

12          MR. KLAUDER:  I have seen the revised order.  It's

13  fine.

14          THE COURT:  All right.

15          MR. KLAUDER:  Thank you.

16          THE COURT:  Thank you.  The deposit waiver order

17  needs a final hearing date.

18          MR. GALARDI:  So will a number of others, Your

19  Honor.  So --

20          THE COURT:  I'll hold that aside.

21          MR. GALARDI:  Hold that aside just until we come up

22  with a schedule for the final DIP and other matters.  Thank

23  you.

24          THE COURT:  Okay.  You're welcome.  Let me look at

25  the wage.  Okay.

MR. GALARDI:  Your Honor, the next matter on the

agenda is item number 7.  It is a Motion for us approving

adequate assurance of payments for utilities.  Your Honor, we

changed it up a little bit this time than we had done in the

past.  Again, I think it's informative.  We've had fights with

utilities and, fortunately, in this case we had enough cash as

well as a small enough utility number that we decided to do a

different game this time with the utilities.  I'm sure they

won't be satisfied but, nonetheless -- as Your Honor knows

from the Code and the fights that you've usually gotten in

with the utilities is within 20 days the Debtor has to make a

proposal for adequate assurance of future -- of performance

for the utilities or adequate assurance.  They then have ten

days under the Code to say it's satisfactory or not

satisfactory.  And if they don't say it's satisfactory, then,

essentially, you have to give them what they want.  What we've

done is try to fit within the Code more specifically one of

the arguments they've made, is if we give them, you know, the

carve-out, the reserve, whatever it is, they don't "receive it

in their hands."  In this case, and turning to the DIP budget

in a minute, what we have done instead is we're going to

prefund them because it's a specific provision of the

Bankruptcy Codes where it says that it's adequate assurance if

you pay them in advance.

    If Your Honor returns to the DIP budget, you will see

1   that there's two groups of -- under number 2, "cash flows,"

2   there are operating disbursements, and under "operating

3   disbursements," roughly six lines, you'll see that there's a

4   utility prepayment and a March stub utility payment.  What we

5   have done and what we request the Court to provide authority

6   for is to pay in advance on the first of the month with

7   respect to the 29 go forward stores the full monthly utility

8   bill.  And not only is it the full monthly utility bill, Your

9   Honor, we've looked at the last seven months, taken the

10  largest utility bill in those seven months and are paying them

11  the largest utility bill in that.  Your Honor, then if you'll

12  look right below that, you will see a March stub utility

13  payment.  So we filed on the 20th.  There will be a bill that

14  will eventually roll in for that stub period.  You will see

15  that we anticipate paying that stub period to catch them up

16  the week of April 10th to the 17th.  So we'll pay that when due.

17      Importantly, Your Honor, you'll also -- so to give Your

18  Honor an idea of what we've also paid, our average monthly

19  with respect to the go forward stores is roughly 330 a month.

20  So there's actually going to be about 158 that they'll owe us

21  as a credit.  So they're getting prepaid and in some sense a

22  deposit.  That's what we have done with respect to the 29

23  stores.

24      Your Honor, then if you'll go down to the closing store

25  expenses, you'll see similar entries with respect to the

1 utilities prepay and the March stub utility payment.  These

2 are the 23 stores that we are trying to close out of.  Instead

3 of giving them the full monthly, Your Honor, because there is

4 a balance between when we exit those stores and paying the

5 full month, we've changed theirs to be, we'll pay them every

6 two weeks in advance.  So on the 1st of the month, we'll pay

7 167, two weeks later we'll pay 167.  Again, in that same

8 period, we'll true up whatever the March stub is and we'll

9 continue to do that.  We believe -- again, if Your Honor

10 approves the store closing Motion or the assumption of the

11 agency agreement, we will be out of these stores no later than

12 May 30th.  So we've covered those payments.  Similarly, and

13 actually it's even more beneficial to these landlords.  So our

14 monthly calculation is 334.  The average happened to be only

15 182.  So there will be about 151,000 a month extra that they

16 will have a credit.  They will be overcollateralized or

17 overprotected by this and then we would anticipate a final

18 reconciliation under the rules.

19          THE COURT:  Okay.

20          MR. GALARDI:  Your Honor, we think this avoids two

21 problems that we've encountered in the past.  One, we won't

22 have an argument with utilities about receipt and, two, we

23 have given and complied strictly with the Code, but in the

24 event that they find this unsatisfactory, Your Honor, we would

25 ask to approve it but to come back on what I'll call day 29.

1   They give us notice and either we'll resolve it or be back

2   before Your Honor before they actually can get more money out

3   of the estate.  Your Honor, those are the changes that we've

4   asked for.  Again, I don't know if any party wants to be heard

5   on this Motion.  The only change to the Motion and the order

6   that we've given you is we had to change the Exhibit B to

7   reflect that the prepayment on the 23 stores was only 50

8   percent of the prepayment monthly.  So that's the one change

9   to the exhibit.  This, too, would need another hearing date

10  within the first 30 days of the case.  So I can hand this up,

11  Your Honor, but we can also hold it aside for setting a

12  hearing date when we go through.

13          THE COURT:  All right.

14          MR. GALARDI:  I don't know if there are other

15  parties that want to be heard on this.

16          THE COURT:  All right.  Please approach.  Does

17  anyone wish to be heard?

18      (No verbal response.)

19          THE COURT:  Okay.  I'll approve the order.  You made

20  me read my Code when I saw what you were doing.

21          MR. GALARDI:  That would change it up --

22          THE COURT:  Sure.

23          MR. GALARDI:  I thought I'd drive the utilities

24  crazy because they're now going to complain that they can't do

25  the accounts on a first day month.  So, I thought I'd have a

1  little fun with the utilities.

2        THE COURT:  You don't get extra points, Mr. Galardi,

3  for degree of difficulty.  All right.  I'll hold this -- I'll

4  sign it but I'll hold it aside till we set the dates.

5        MR. GALARDI:  I understand that I'm not the only one

6  that appeals Your Honor's order.  The utilities have done that

7  too.  So I figured I'd protect you from an appeal, Your Honor.

8        Your Honor, moving now to number 8 on the agenda.  This

9  is the Debtors' Motion to pay sales and use and other trust

10  fund taxes and then the only new wrinkle to this, Your Honor,

11  is for us to pay the fishing and game taxes.  Your Honor, the

12  only concern raised by the U.S. Trustee with respect to this

13  Motion is that we had asked for $4 million worth of authority

14  to pay that.  Your Honor, the way in which we calculated $4

15  million is essentially the following.  We pay roughly 60

16  percent on sales.  That number came to about $2.2 million in

17  sales and use and other taxes.  Last month it was 2.4.  So it

18  can be a little bit higher and, given the store closings and

19  running thing, it can even be a little higher than that.  So

20  we were concerned about that.

21        The licensing and games and fishing fees are $1.34

22  million.  So, Your Honor, we saw it to be about 2.7 to 2.8, I

23  mean 3.7 to 3.8 when you added those numbers together.  So we

24  thought it would be safe to ask for $4 million of relief and

25  it's up to $4 million again, Your Honor.  One is an

accommodation.  The other is probably an out of state property

with its trust fund and sales and use taxes.  We do need our

fishing and game licenses.  We've put those together and we

would ask Your Honor to approve it.  I think the U.S. Trustee

was simply concerned about explaining how we arrived at the $4

million number rather than the actual relief requested.

             THE COURT:  Okay.  Does anyone wish to be heard?

             MR. KLAUDER:  That is correct, Your Honor.  We have

no objection.

             THE COURT:  All right.  Good.  You may approach.

             MR. GALARDI:  There are no changes to this order,

Your Honor.

             THE COURT:  Very good.  I'll approve it.  Thank you.

             MR. GALARDI:  Your Honor, number 9 on the agenda is

the Debtors' Motion to continue certain customer practices.

This is really refunds, gift cards, etcetera.  The Trustee had

raised a concern whether we were changing procedures with

respect to open and closed stores.  Similarly, we had concerns

from Ms. Cordry with respect to the agency agreement, that

we're going to go through later on, as to whether we were

changing any of the policies.  We are not changing any of the

policies with respect to gift cards.  We are still allowing

those persons to come and redeem them.  We are not changing

any policies with respect to the refunds or any other customer

practices, such as giving them the fishing and game license.

1  We know of no other objections to this.  It is not actually a

2  cash outlay in any sense other than you may have to refund

3  money or you may have to honor gift cards or refunds or, for

4  example, later on we'll talk about latent defects and taking

5  the goods back for latent defects under the agency agreement.

6  We are not changing any policies.  We do believe we'll be a

7  continuing operation.  We think this is critical to the

8  business.  We've had no objections from the U.S. Trustee with

9  that explanation, only a concern of whether we were changing

10 policies and have to notify the state attorney generals and

11 since we're not, we think we're -- we've not heard anything

12 from the state AGs --

13         THE COURT:  Okay.

14         MR. GALARDI:  -- and the U.S. Trustee.

15         THE COURT:  Does anyone wish to be heard?

16     (No verbal response.)

17         THE COURT:  I'll approve the order.  Thank you.

18 Okay.

19         MR. GALARDI:  Your Honor, the next Motion is a

20 Motion to approve authority for seeking paying prepetition

21 shipping charges and delivery charges with those shipping

22 freight vendors that have goods in transit.  We believe, and

23 we've estimated in the Motion, that we think that the amount

24 of goods that are in transit are the amount of shipping

25 charges that we would owe to get the goods in transit to the

1  stores is approximately $750,000.  We have asked for a million

2  dollars of authority, since experience has told me sometimes

3  we need more than what we actually have in the system.  Again,

4  the U.S. Trustee expressed a concern about if the estimate is

5  750, why a million.  I gave him exactly that explanation, that

6  experience.  We hope to keep this as small as possible.  I

7  think that was the only concern.  We believe that the goods in

8  transit are worth more, obviously, than the 750 to deliver

9  those goods and we would ask Your Honor to approve the

10  authority to pay those prepetition shipping charges.

11        THE COURT:  All right.  Does anyone wish to be

12  heard?

13     (No verbal response.)

14        THE COURT:  I'll approve the Motion.  Thank you.

15  Okay.

16        MR. GALARDI:  Your Honor, the next Motion is the

17  Debtors' Motion to continue their existing insurance policies,

18  many of which are premium finance insurance policies.  We are

19  in the process right now -- most of them are nine month

20  payments.  Again, the U.S. Trustee guidelines require that we

21  keep our insurance in good form.  It's just good business

22  practice to do so.  Most of those policies are nine month

23  payments.  We are into the shorter period of the payments, so

24  we probably have some excess.  We could stop paying for a

25  little bit of time but, again, to keep the insurance and

1  uninterrupted insurance programs, we've asked Your Honor for

2  authority to continue to make those payments in the ordinary

3  course.  U.S. Trustee had no comment on that and we would ask

4  Your Honor to approve it.  I think it's a fairly standard

5  First -Day.

6          THE COURT:  Does anyone wish to be heard?

7      (No verbal response.)

8          THE COURT:  I'll approve the Motion.  Thank you.

9  I'll hold this aside as well.  It needs a date.

10          MR. GALARDI:  Right, Your Honor.  We see that as the

11  financing.  So we think it's probably appropriate to do it on

12  an interim basis --

13          THE COURT:  Very good.

14          MR. GALARDI:  -- and have a final hearing.  Your

15  Honor, the next one is number 12, which is the Debtors'

16  request to pay certain vendors, critical vendors, up to $5

17  million.  Your Honor, I can proffer up the testimony or rely

18  on the declaration of Mr. Rourk -- Mr. Rourk Kemp.

19          THE COURT:  I think the declaration is sufficient

20  unless anyone would like a fuller record.  That's fine.  It's

21  admitted into evidence without objection.

22          MR. GALARDI:  Your Honor, just again, very briefly.

23  One, the authority is up to $5 million.  As Your Honor knows,

24  the value of this is the carrot that it can provide to the

25  vendors.  There is, as I mentioned at the outset, Mr. Kemp's

declaration sets forth $80 million of unsecured trade debt.

That's important.  Your Honor, also with respect to just our

top 25 vendors that we would anticipate being in the list, and

we've shared the list with the U.S. Trustee, I think we've

shared it with the banks and with Seidler.  Those top 25

vendors, and we don't want to be stuck to that list, but those

top 25 vendors are owed roughly $15 million to $17 million as

we sit here today.  So we are not paying them in full by any

stretch of the imagination.  Again, it is subject to the

standard caveats that we have to get trade terms, which

obviously are important to us, in exchange for any payments.

There are some warehouseman's.  As set forth and as would be

in the testimony with respect to the DIP and Mr. Weinsten, we

are desperately in need of goods.  We have been stretching the

payables, as evident by the $80 million of outstanding.  In

order to prime the pump and get trade terms and hopefully use

less of the roll or less of the DIP, it would be our request

to use up to $5 million to pay that.  Obviously, when a

committee is formed, we'll give the committee notice of any

payments.  We reserve our rights to come back if we needed

more but right now the DIP lenders are supportive of the 5

million as is Gordon Brothers, and we'd ask Your Honor to

approve it.  Again, sole source, possible bankruptcy, and also

goods that are just simply necessary, for example, in the guns

and ammo, which we need and goes flying out the stores right

1  now.

2  THE COURT:  All right.  Does anyone wish to be

3  heard?  I'll approve the Motion.

4  MR. GALARDI:  Thank you.

5  THE COURT:  Thank you.  You want to skip to the

6  rejection?

7  MR. GALARDI:  Surely.

8  THE COURT:  Save the DIP and the sale for last.

9  MR. GALARDI:  Thanks.

10  THE COURT:  Or not sale -- or GOB.

11  MR. GALARDI:  That's fine, Your Honor.  Not even

12  GOB, Your Honor, just store closing.

13  THE COURT:  Store closing.  Sorry.

14  MR. GALARDI:  Your Honor, the next one is a Motion

15  to reject six closed stores and three leases with respect to

16  six closed stores and three construction stores.  Again, Mr.

17  Kemp is in the courtroom today.  The understanding is that we

18  have surrendered the keys and surrendered the premises prior

19  to the 20th or the filing of this case.  We would ask,

20  obviously, so as to not pay administrative rent with respect

21  to these properties during the course of this case, to be

22  authorized to reject those premises.  Your Honor, I guess

23  maybe this morning I got a little generous and added a

24  paragraph to this order that said, even if we reject it, to

25  get Your Honor comfortable -- not that I'll ever concede that

this is the case and it's probably more like (indiscernible) -
- we have put in the order that the landlords, if we should
still have use and occupancy after the date of the rejection,
they still have right to come in and seek a 503(b) claim with
respect to that, should we have done something that they want
to argue there wasn't an effective surrender so as to not
prejudice people, since they've only gotten that Motion on
Friday.  Your Honor, we think that this is -- you know, we've
had this relief in <u>Goody's</u> and other cases.  We think it's
appropriate given the surrender and, again, all landlords'
rights to argue that we didn't effectively surrender and that
they can have a 503(b) claim after the rejection date have
been expressly now reserved in the order.  We'd ask Your Honor
to approve the rejection.  These are -- we have not found
takers for these properties.  They have been closed down for
some time, with respect to the six.  We can't afford the
construction costs nor do we want to open new locations at
this point in time.  So we think it's in the business judgment
of the Debtors to reject these leases.

THE COURT:  Does anyone wish to be heard?  Yes,
ma'am.

MS. THOMPSON:  Good afternoon, Your Honor.
Christina Thompson.  I'm appearing today on behalf of Inland
Southwest Management.  I just learned before the hearing that
I believe Inland has one lease that is subject to this Motion

1    to reject.  It's the one in Lewisville, Texas.  As I read the

2    Motion, I believe that the landlords were supposed to be given

3    an opportunity to come back after -- if the order was entered

4    today and raise and objection to this Motion rather than just

5    be granted a claim to come back if there's an issue over when

6    the lease was stopped.

7            THE COURT:  Under our local rules you have 30 days

8    to contest any First-Day Motion other than financing and the

9    burden of proof remains on the Debtors to --

10           MR. GALARDI:  I have no objection --

11           THE COURT:  -- prove that up basically at a

12   reconsideration issue.  So I think you have that under the

13   local rules.

14           MR. GALARDI:  I have no objection to putting the

15   language about 503(b)(1).  So --

16           THE COURT:  Okay.  Is that all right, Ms. Thompson?

17           MS. THOMPSON:  That's fine, Your Honor.  Thank you.

18           THE COURT:  Very good.  Mr. Saydah?  They're

19   sneaking up on you.  We're going to buy you an apartment in

20   Delaware, Mr. Saydah.  You're here all the time.

21           MR. SAYDAH:  Should have kept my house here.

22   Briefly, Your Honor, for the record, Gilbert Saydah from

23   Kelley Drye & Warren on behalf of Hawkins Companies and

24   Developers Diversified Realty.  Your Honor, Hawkins has three

25   of the locations on here and DDR has one of the locations.  We

1    just also wanted to reserve our rights with respect to whether

2    or not there had been an effective rejection and further to

3    argue with respect to whether or not -- I'm not sure if we

4    have any guarantees, but whether or not rejection of the

5    guarantee is appropriate. I'm not sure it's actually an

6    executory contract that's subject to rejection but I just

7    reserve our rights.

8          THE COURT: Okay. All right. This has got dates in

9    it as well. So I'll sign the order and I'll hold it aside.

10         MR. GALARDI: Your Honor, I now would go to matter

11   16, which I found in the Lyondell case, so I thought I would

12   try it here. It's the ipso facto automatic stay. Some

13   history about this Motion, Your Honor. As Your Honor may

14   recall, I mean, generally one of the Motions that we file

15   First-Day, although I think the Bankruptcy Code has now

16   changed, is a reclamation motion, where you do a number of

17   things in that reclamation motion. It has generally four

18   parts of relief. One is the postpetition delivery. We

19   confirm that if it's a postpetition delivery on a prepetition

20   invoice you'll pay up. We put that in the shipping Motion

21   this time as opposed to in a reclamation motion. The other

22   thing that we do as an abundance of caution in those instances

23   is to confirm that 362 is still applicable, that people can't

24   come in and use self-help remedies. And, also, what I found

25   interesting about this one is that it also makes clear to

1    parties that there's an ipso facto clause.

2        The whole purpose of this order is to have a simple,

3    straightforward order that confirms to persons perhaps

4    unfamiliar with bankruptcy that 362 applies, that you can't

5    simply not perform because of the bankruptcy clause.  We have

6    cited authority for it.  It has been entered in Delaware

7    before.  It was recently entered in the Lyondell decision and

8    we thought with respect to this it was particularly important.

9    For example, we are not filing a reclamation motion.  We are

10   inviting reclamation claimants if they really want their goods

11   back to come in, move to lift the stay, file the adversary

12   proceeding and we'll address those at that time.  So

13   reclamation claimants should not stand on their rights in this

14   case.  And so I note the absence of that but it is important

15   in that absence to let the reclamation claimants know that

16   there is a 362 stay and there are appropriate steps that

17   they'd have to take.  It may be a comfort order but it's a

18   comfort order that they have found very useful in other cases

19   that you can supply the vendors who are acting up or seizing

20   goods so that they have that law in front of them.  So we

21   would ask Your Honor to approve the Motion number 16, but I do

22   note that I haven't seen it myself before but I thought it was

23   a nice one.  So I would use it.

24            THE COURT:  All right.  Does anyone wish to be

25   heard?  Mr. Klauder?

1　　　　MR. KLAUDER:  Your Honor, again, it just being a

2　comfort order, I don't necessarily see the purpose to it.  I

3　mean, I'm not going to stand up here and fight to the death on

4　this one but I didn't really see the purpose behind the order.

5　　　　THE COURT:  I disagree.  I see the purpose behind

6　the order and we routinely enter these in cases where the

7　Debtor is operating with foreign vendors, etcetera, overseas,

8　because persons in other countries certainly aren't aware of

9　the -- generally aware of the terms of the Bankruptcy Code.

10　Although persons in this economy are becoming probably more

11　aware of bankruptcy than they would wish, I see the usefulness

12　and I reviewed the language and I didn't think it was

13　particularly offensive and didn't restate the law in an

14　inaccurate way.  So I'll approve the order.

15　　　　MR. GALARDI:  Thank you, Your Honor.

16　　　　THE COURT:  Thank you.

17　　　　MR. GALARDI:  Our vendors sell guns.  So it also

18　helps, Your Honor.  Your Honor, I think, if I'm not mistaken,

19　that then leaves the two Motions that Your Honor had mentioned

20　we would leave for last.  One is the DIP Motion and the other

21　is the Debtors' Motion to assume the agency agreement.  Your

22　Honor, what I would like to do on this is, one, rest on the

23　declaration but, two, I think probably because I know Your

24　Honor is leaning on a few of these things, I'd like to call

25　Mr. Weinsten to the stand and actually have direct testimony

1  as to both the DIP and the agency agreement and how we got

2  where we are, because I think that will be helpful for the

3  record, and let him be subject to cross-examination.

4          THE COURT:  That's fine.

5          THE CLERK:  Please raise your right hand.  State and

6  spell your name for the record.

7          MR. WEINSTEN:  Mark Robert Weinsten, W-E-I-N-S-T-E-

8  N.

9      MARK ROBERT WEINSTEN, DEBTORS' WITNESS, SWORN

10                  DIRECT EXAMINATION

11  BY MR. GALARDI:

12  Q.   Mr. Weinsten, by whom are you employed?

13  A.   FTI Consulting.

14  Q.   And how long have you been employed by them?

15  A.   Twelve years.

16  Q.   What is your -- briefly, your Chapter 11 experience?

17  A.   I've been involved with anywhere from 40 to 50 cases over

18  that period of time as an advisor and an interim account

19  executive.

20  Q.   Okay.  And what about with respect to retail Chapter 11

21  experience?

22  A.   Probably approximately 25 to 30.

23  Q.   And what's FTI's relationship with this case?

24  A.   We are the financial advisor to the Debtor.

25  Q.   And what's the responsive -- what are the responsive --

1  when did you take on that role?

2  A.   We were retained somewhere in the October/November time

3  frame to assist the company with liquidity projections,

4  business planning, assess expense reductions, things of that

5  nature.

6  Q.   Okay.  And what have the responsibilities been of FTI

7  since that time?

8  A.   Most recently, we have assisted the company, again, with

9  refining the liquidity projections, preparing for the Chapter

10  11 filing, working with the banks to arrive at a satisfactory

11  DIP and assist them with the solicitation execution of the

12  store closing process.

13  Q.   Okay.  And during that course of time, did the company

14  come to have certain liquidity issues?

15  A.   Yes.

16  Q.   And was there a transaction ever contemplated by the

17  company?

18  A.   Yes.

19  Q.   Could you describe that transaction and what your

20  understanding of it is?

21  A.   There was a point in time where the company had entered

22  into an agreement to sell itself to UFA, United Farmers of

23  Alberta.

24  Q.   Okay.  And what happened with that transaction?

25  A.   There was -- well, simply the transaction was never fully

1    consummated as it was originally structured.  What happened

2    was UFA made an initial investment into the company of $30

3    million, which provided them with certain options concerning

4    taking possession of stores, but they never -- the initial

5    price or investment contemplated was $90 million and they

6    never consummated the $90 million deal.

7    Q.    Okay.  I'm sorry.  Go ahead.

8    A.    So eventually they most recently took possession of the

9    15 stores with the $30 million investment as a setoff.

10   Q.    And was that an option under the original agreement?

11   A.    Yes.

12   Q.    And when was the original transaction supposed to close?

13   A.    I believe it was December.

14   Q.    Of --

15   A.    2008.

16   Q.    And then was that date extended?

17   A.    It was extended.

18   Q.    And when was it extended to?

19   A.    Gosh, I believe it was some time in March, perhaps the

20   end of February.

21   Q.    Okay.  Let me ask you, did the UFA transaction have an

22   effect in your view on the company's liquidity?

23   A.    Yes, it did.

24   Q.    Please explain.

25   A.    A couple things.  First of all, because of the prospect

1   of doing the UFA transaction, the banks were preparing to

2   exercise its remedies because the company was in default at

3   the time, decided to hold off exercising some of their rights

4   in order to facilitate the UFA transaction.  Nevertheless,

5   during that period of time, the company was very liquidity

6   constrained and didn't have the resources to adequately -- or

7   purchase inventory to adequately stock the stores.  Because

8   the deal did not close, we never got the infusion of cash the

9   company required to stock those stores.

10  Q.   Did the company obtain trade terms from its vendors

11  during this period of time?

12  A.   The company did not other than with a few small accounts,

13  did not get any meaningful trade terms.

14  Q.   Okay.  Now as of March 1, 2009, how many operating stores

15  did the company have?

16  A.   67.

17  Q.   Okay.  And what steps did the company take to address its

18  liquidity problems in the beginning of March?

19  A.   At the beginning of March, the company looked at several

20  options and came to the conclusion that one thing that should

21  be done immediately is to close certain stores that were

22  either underperforming, not strategically located and,

23  additionally, the benefit would be by getting out of those

24  stores what limited resources the company had could be

25  concentrated on the better go forward stores.

1  Q.   Now did the banks -- did the company start discussing

2  alternatives with the banks at that time?

3  A.   Yes, it did.

4  Q.   What was the banks' position at that time?

5  A.   The banks were actually, at that point in time -- there

6  was a preference for getting bids for a full chain

7  liquidation.

8  Q.   And commencing a Chapter 11 process?

9  A.   Yes.

10  Q.   In what sort of a time frame?

11  A.   Very quickly.

12  Q.   Like the first week of March?

13  A.   Yes.

14  Q.   Now in addition to the closing of the stores, what other

15  things did the company contemplate or do during this period of

16  time?

17  A.   The company went out and looked at filing Chapter 11 but

18  at the same time looked at talking to potential lending

19  institutions about what kind of financing options were out

20  there.   There were last minute attempts to raise capital

21  either through angels or other equity providers.   And there

22  were a certain amount of pressure put upon UFA to attempt to

23  finalize the deal, either the entire deal or the 15-store

24  option deal.

25  Q.   Okay.   Now why did the company want UFA to -- in your

1  opinion, why did the company want UFA to close on the

2  transaction?

3  A.   Well, on the 15 stores, the price -- take a step back.

4  The company currently can borrow approximately at a 68 percent

5  advanced rate on its inventory, which effectively comes down

6  to 61 percent when you account for certain reserves.  The UFA

7  transaction contemplated purchasing the inventory at 93 cents.

8  So there was an immediate liquidity boost if you take the

9  difference between the 93 and 60 some odd percent.  So it

10 would provide an immediate infusion of cash into the business,

11 or availability I should say.

12 Q.   Okay.  Now, you said that the company -- did the company

13 start to solicit persons interested in liquidating the

14 inventory?

15 A.   Yes.

16 Q.   And how many people -- how many entities were solicited?

17 A.   Six or seven.  I don't recall but we eventually got down

18 to three bidding parties.  There were two standalone bidders

19 and there was one syndicate of three, four liquidators in that

20 syndicate.

21 Q.   And how many stores did the company solicit to close

22 pursuant to store closing sales?

23 A.   Well, the number varied but eventually we arrived at 27

24 for the number of stores that we had put out for bid.

25 Q.   Now was there any significant (*sic*) about any subset of

1 those stores to UFA?

2 A.    Yes.  There were four stores in the 27 that were part of

3 the 15 that were contemplated by the UFA option.

4 Q.    Okay.  And what was UFA's reaction to that, if you

5 recall?

6 A.    They were not happy and they made various threats if we

7 were to go forward with the liquidation of those stores

8 because they believed that it was a violation of their rights

9 under their option agreement.

10 Q.    Okay.  Now did the company eventually conduct an auction

11 with respect to the store closing sales?

12 A.    Yes, it did.

13 Q.    And could you describe the auction that was conducted?

14 A.    Certainly.  We conducted an auction -- well, take a step

15 back.  First we received a stalking-horse bid.  Hilco put

16 forth a stalking-horse bid at a substantial premium to the

17 appraisal.  Their bid was somewhere in the 74 cents I believe

18 guaranty and, again, our appraisal was at 68.  We used that

19 stalking-horse bid as the basis for the auction and we

20 commenced it and one of the parties decided to step out of the

21 process for their own reasons and so we had an option between

22 Hilco and Gordon Brothers using the 74 cent stalking-horse bid

23 as the basis.

24 Q.    And who was ultimately the successful bidder?

25 A.    Gordon Brothers was.

Weinsten - Direct

1  Q.   And do you recall the price for which it was the

2  successful bidder?

3  A.   Yeah.  The price -- the winning bid was at 77.6 cents.

4  Subsequent to that, they would be entitled to a 3-1/2 percent

5  fee and then there was 50 sharing beyond that point.

6  Q.   Okay.

7  A.   And the other thing I should mention that's germane is,

8  we also negotiated with them the option to put the four --

9  take the four stores out of the their deal to preserve the

10 opportunity to sell those to UFA and we negotiated what the

11 cost would be to remove those four stores out of their bid.

12 Q.   And did we do the negotiation -- do you recall whether

13 the negotiation on the four store carve-out was before or

14 after the auction?

15 A.   I believe if I recall, and I may be off a little bit, but

16 I believe that we introduced the concept at the time of the

17 auction and didn't finalize it until after the auction.

18 Q.   And then did UFA eventually come forward?

19 A.   Yes.

20 Q.   And what sort of time frame was that?

21 A.   Very quickly thereafter.  Maybe within a day.

22 Q.   Okay.  And did ultimately those four stores get carved

23 out?

24 A.   Yes, they did.

25 Q.   And ultimately did the UFA transaction get closed?

1  A.   Yes, it did.

2  Q.   Okay.  Now with respect to -- so we're down to 23 stores.

3  Is that correct?

4  A.   Twenty-three stores that are being subject to the agency

5  agreement with Gordon Brothers.  Yes.

6  Q.   Okay.  And as you sit here today, have store closing

7  sales begun at those 23 stores?

8  A.   Yes.

9  Q.   Do you have a recollection of when those were started?

10  A.   I believe it was -- if the 10th was a Saturday or the 11th

11  -- it was a Saturday I believe.

12  Q.   Okay.  And was there a contemplation of bankruptcy in

13  that agreement?

14  A.   Yes, there was.

15  Q.   And what are the consequences of filing a bankruptcy on

16  that agreement and the payments under that agreement?

17  A.   By a certain date we needed to have filed and had an

18  interim order entered, otherwise that there is a reduction in

19  the price for each day that goes by where that has not taken

20  place.

21  Q.   And do you recall what the reduction is?

22  A.   Three-tenths of a point.

23  Q.   And do you know in cash dollars what each day actually

24  costs the estate?

25  A.   It cost $300,000.  Is that -- give me a second here.  It

1  was --

2  Q.   I'll give you a hint.  It's half of that.

3  A.   Yeah, yeah, it's 150.  I was going to say because two

4  days is 300,000.

5  Q.   Right.

6  A.   I had the 300 in my --

7  Q.   So now if we go through -- and I think you'll answer my

8  next question accurately.  So we've missed the two days.  The

9  date was March 20th.  Is that correct?

10 A.   Yes.

11       THE COURT:  Just answer your own questions, Mr.

12 Galardi.  It's what you usually want to do anyway.  So --

13       MR. GALARDI:  I was trying to be well behaved this

14 time, Your Honor.

15       THE WITNESS:  My mistake for not having the correct

16 answer, Your Honor.

17       THE COURT:  No one wants to -- okay.

18 BY MR. GALARDI:

19 Q.   So as we sit here today, how much has the company roughly

20 lost by not having an order by March 20th?

21 A.   300,000.

22 Q.   Okay.

23 A.   That's relevant.

24 Q.   You can do that one.

25 A.   That was the question.

1   Q.   Now, Mr. Weinsten, in your view are the banks -- and by

2   the banks, I mean both the DIP lenders and Gordon Brothers --

3   are they oversecured or undersecured?

4   A.   I believe them to be oversecured.

5   Q.   And why -- how did you come to that determination?

6   A.   From a couple of bases but the most relevant is we're

7   borrowing at a 68 percent appraisal and believe that with the

8   bid at 77.6 cents it's a pretty strong indicator that the

9   value of the inventory in the remaining stores is, if not

10  77.6, in that range.  On the one hand I can argue that it

11  would be more because we have the best stores remaining, which

12  would command a higher price, but there are other issues that,

13  you know, could also reduce that value.  So if it's, you know,

14  in the 77 cent range, that's clearly a premium over the 68.

15  Q.   And is inventory the only thing on which they have liens?

16  A.   No.

17  Q.   And you're just basing that on inventory; correct?

18  A.   Just on inventory.

19  Q.   Now Mr. Weinsten -- if I may approach, Your Honor.  Mr.

20  Weinsten, can you identify the document that I just handed up

21  to you?

22  A.   This is the 13-week DIP forecast.

23  Q.   And there is backup to all of these pages but I tend to

24  use a one-pager.  Is that correct?

25  A.   That is correct.

1  Q.  Okay.  Now did you have a hand -- you and FTI created

2  this budget along with the company?

3  A.  Yeah.  We worked with the company that developed this.

4  Q.  Okay.  Now, have you reviewed the company's expenses or

5  someone at FTI review the company's expenses?

6  A.  Yes.

7  Q.  And do you believe this accurately reflects the company's

8  expenses and anticipated receipts for that 13-week period?

9  A.  As any projection, there are some assumptions made but,

10  yes, I believe it's an accurate portrayal.

11  Q.  Okay.  So now the first thing I want you to look at is

12  down on the bankruptcy disbursements.  You see that there are

13  fee numbers; correct?

14  A.  Yes.

15  Q.  And what are those numbers?

16  A.  Are you referring to any specific one?

17  Q.  The GB DIP fees and the GE DIP fees.

18  A.  The GB DIP fees are 750,000.  The GE DIP fees are

19  1,500,000, which are the fees proposed to be paid to those two

20  institutions in exchange for the DIP they're providing.

21  Q.  Have you seen the exit -- have you seen the financing

22  commitment letters?

23  A.  Yes.

24  Q.  And those are the numbers in those letters?

25  A.  Yes.

1  Q.    Now with respect to -- now does the company presently

2  have liquidity under its prepetition financing agreements?

3  A.    It does.

4  Q.    Okay.  So if the company remained outside bankruptcy,

5  would it have availability?

6  A.    For a period of time.

7  Q.    Does it have adequate liquidity to restore the business

8  of the 23 stores?

9  A.    25.

10  Q.    25 stores.  I'm sorry.  I got my numbers wrong.

11  A.    No, it does not provide adequate liquidity.

12  Q.    Why not?

13  A.    For a couple of reasons.  One, we would eventually be

14  burning -- you know, just based on the projected cash burn of

15  the company, we would eventually use up the availability, if

16  everything else remained the same.  Secondly, there's

17  approximately $80 million of prepetition trade out there that

18  we would not have the ability to address.  So for those two

19  reasons, primarily we could not have done this outside of

20  Chapter 11.

21  Q.    Is the company presently receiving vendor demands?

22  A.    Some.

23  Q.    Is the company receiving landlord demands for payment?

24  A.    Yes.

25  Q.    Okay.  Is the company currently receiving trade terms?

1  A.   No.  Well, by and large, no.  There are always some

2  outliers but nothing meaningful.

3  Q.   Okay.  And is the company receiving the most desirable

4  product on a timely basis?

5  A.   No.

6  Q.   At this time, what are the best selling products in the

7  stores?

8  A.   Guns and ammunition.

9  Q.   And is there a shortage of guns and ammunition?

10 A.   Yes, and fishing products as well.  The company -- we're

11 moving into fishing season and we're short there as well.

12 Q.   Okay.  Upon the filing, does the company have an

13 immediate need for liquidity for borrowing?

14 A.   Not immediately but shortly --

15 Q.   Go ahead.  Answer the question and then I'll --

16 A.   Put it this way.  There's an immediate need to use cash

17 and to restock stores very quickly.  So while on day one

18 there's not immediate need, shortly, within the next couple of

19 weeks, there will clearly be a need for incremental liquidity.

20 Q.   If you file bankruptcy and you don't have use of cash

21 collateral, does the company have money to pay its vendors?

22 A.   I'm sorry.  "Without" you said?

23 Q.   Without cash collateral?

24 A.   No.

25 Q.   Without the DIP lending or the roll or the proposed DIP

1  lending, does it have money tomorrow to pay vendors?

2  A.   Without the DIP, no, we wouldn't be able to spend any

3  money.

4  Q.   Now, did the company -- could you describe what the

5  current reserves prior to the filing, the current reserves

6  under the prepetition facility are?

7  A.   Certainly.  There are two main -- the two main reserves.

8  One is there's a block, a liquidity block that's now $15

9  million that has been put in place to assure sufficient

10  cushion above what we're borrowing and there's also a standard

11  gift card reserved that is also reflected in the reserves in

12  the document.

13  Q.   Did the company approach the banks regarding reducing the

14  reserve outside of the filing?

15  A.   Yes.

16  Q.   And what was their response?

17  A.   No, they would not do it.

18  Q.   And what is happening if the DIP lending is proposed --

19  is approved?

20  A.   The reserve will be reduced by $10 million, thereby

21  creating an additional $10 million of liquidity for the

22  company.

23  Q.   And do you believe the company requires this $10 million

24  of availability?

25  A.   Yes, it does.

Weinsten - Direct

Q.    Why?

A.    Because right now, as I've said earlier, our stores are severely underinventoried, probably on the average of 30 to 40 percent per store, and in order to effectuate a successive reorganization, we need to get goods back in those stores. This DIP will allow us to do it and the budget contemplates buying the levels of inventory to sufficiently stock the stores, which we couldn't do without the incremental availability.

Q.    Okay.  Now before the filing, did the company contemplate various financing options?

A.    Yes.

Q.    Could you please describe what the company contemplated?

A.    Well, we talked about UFA.  We also talked to other lenders, both the traditional ABL lenders as well as the nontraditional hedge fund community to provide financing.  We also talked to -- or I personally didn't but the company talked to potential equity investors as well as, you know, the existing investors about potentially making capital available and none of those efforts were fruitful.

Q.    Okay.  So let's just go back to the ABL lenders.  How many ABL lenders did the company talk to?

A.    Three or four.

Q.    And in this environment, you've done --

A.    Actually four.

1  Q.    -- a number of retail; correct?

2  A.    Yes.

3  Q.    Are there many ABL lenders currently making loans to

4  retail companies?

5  A.    No.

6  Q.    How many?

7  A.    At least in the recent deals I've been involved with,

8  nobody has been willing to take out the existing lenders.

9  There's been no interest and I'm not talking about priming.

10  I'm talking about just taking them out and removing the

11  facility and there's been no interest to do it.

12  Q.    And what about an interest in the priming market?

13  A.    Even less so, particularly since there are several

14  members of this bank group, many of whom would be the logical

15  people to do the financing, and they're not going to prime

16  other members of their bank group.

17  Q.    So did it have any offers to do DIP financing on either a

18  priming basis or a takeout basis?

19  A.    There is one offer from the mezzanine lender to provide a

20  DIP.

21  Q.    And why didn't the company pursue that alternative?

22  A.    There were various intercreditor issues that would have

23  raised more problems for the company.  So we decided to

24  approach both the senior and the mezzanine and come to a

25  consensual arrangement that was in the best interests of all

1   the parties and, most importantly, the Debtor.

2   Q.    And was that proposal made before or after the UFA

3   transaction?

4   A.    It was prior.

5   Q.    And with respect to that proposal, did that have an

6   implication upon the restructuring plans of the company?

7   A.    Yes, it would have limited the company to a very short

8   Chapter 11 process that would not have afforded the time to do

9   a reorganization.  It would have been a limited amount of time

10  to market the company and undertake a 363 or a full-blown

11  liquidation.

12  Q.    And when you say a limited time, do you have a

13  recollection of the time period?

14  A.    It was 30, 45 days, somewhere in there.

15  Q.    Now did the company also consider the use of cash

16  collateral?

17  A.    Yes.

18  Q.    And, in particular, did the company pursue -- well,

19  strike that.  Why didn't the company pursue the consensual use

20  of cash collateral?

21  A.    Couple reasons.  First of all, the company believes that

22  there would certainly have been a cost associated with the use

23  of cash collateral and while -- who knows what that eventual

24  price would be but it would not have been inexpensive.  So if

25  you look at that, the price of the use of cash collateral

1  versus what we're paying for the DIP, it would not have been a

2  dramatic difference.  Secondly, the DIP provides us -- there's

3  more flexibility as far as when we need money and, you know,

4  as far as borrowing, paying down, there's more flexibility

5  there whereas if your cash collateral -- clearly, we were not

6  going to be increasing our borrowings.  Thirdly, the DIP

7  provides an exit facility, which is critical given the

8  company's plans to attempt reorganization, and the exit

9  facility is of great value to entice someone to fund the plan

10  knowing that there are the

11  -- you know, the outlines of an exit facility there that can

12  fund a company going forward upon an equity investment.

13  Q.    And let's pursue the exit -- there's not a commitment.

14  Is that correct?

15  A.    It is not a commitment.

16  Q.    And what do you say, it's an outline?  Could you just

17  describe what --

18  A.    I mean, I think it provides the structure.  It provides

19  the interest on the banks to provide the financing but it

20  provides the terms of the financing.  So it's very clear the

21  pricing, the availability, etcetera.  So there is -- you know

22  -- so that's what I mean by outlining the parameters.  I mean,

23  I think they went as far as they can go without making a bona

24  fide commitment.

25  Q.    And why did you think that was important to the company?

A.   Well, I think it's critical on a couple of fronts.  First
of all, from the standpoint of attracting equity to the
business, knowing that there's interest in financing an exit
is important.  Secondly, I think it sends a very strong
message to the vendor community that, you know, we have a DIP,
we're able to borrow, we're able to pay and there's a level of
commitment from the banks to support us as well as the time.
You know, I'm stepping away from the exit for a second now.
But, you know, the DIP gives us a certain amount of time to
execute a reorganization.  So when you look at that time frame
that was provided in conjunction with the exit, I think it
sends a very strong message.
Q.   Did the company also consider the nonconsensual use of
cash collateral?
A.   Yes.
Q.   And why didn't the company pursue that?
A.   At the end of the day, the -- I think any time you
attempt nonconsensual use of cash collateral, it's expensive.
It can be ugly.  You run a risk of not prevailing.  But then
also during the course of those discussions or debates, you've
likely alienated those institutions that are most likely to
fund an exit, which is clearly not in the company's interest.
If there are only, you know, a handful of banks that are
likely to support the exit of the company by providing the
exit facility, the last thing you want to do is go to war with

1  them and give them less incentive to fund that exit.

2  Q.    Now the DIP provides certain milestones as it currently

3  stands.  Is that correct?

4  A.    That is correct.

5  Q.    What's your understanding of those milestones?

6  A.    The first milestone, I believe within 40 days we need to

7  file a plan or have an equity commitment or a term sheet for

8  363.  Within 70 days, I believe we have to have the disclosure

9  statement approved.  In 115 days we must have the plan

10  approved and I believe it's effective on 126.

11  Q.    Would you have liked longer time frames?

12  A.    Yeah.  Longer is always better.

13  Q.    But do you think that the company can perform within

14  those time frames?

15  A.    Yes.  I believe -- I do believe the company has

16  sufficient time to meet those milestones and to effectuate a

17  successful plan.

18  Q.    Were the fees to be paid with respect to this facility,

19  were they the result of negotiations?

20  A.    Very much so.

21  Q.    And how have they changed over the course of the month?

22  A.    The initial fees were -- initial fees contemplated were -

23  - I'm doing the math in my head very quickly -- were almost

24  double what we eventually ended up with.

25  Q.    And was the time frame for the milestones negotiated?

A.   Again, very much the initial time frame for that initial

fee structure was the 30 to 45 day process.

Q.   Okay.  And also was there a negotiation over the amount

of the carve-out?

A.   Yes, there was.

Q.   And can you explain the negotiations there?

A.   The initial discussions over the carve-out were purely

over the dollar -- the dollars -- and then what we discussed

was changing the structure.  So making it based on accrued

expenses capped at a certain level and then there were

negotiations on, you know, what the expense budget would be

for the professionals that that accrued, because they're being

accrued based on the budget, and we had discussions on the

budget and we eventually arrived at something that was

amenable to all parties.

Q.   Now, what's your understanding -- we call it a roll --

what's your understanding of that?

A.   Basically the receipts that are coming in are used to pay

down the prepetition and the borrowings will be against the

new facility.

Q.   And were the banks willing to do this beyond any other

than a roll?

A.   I don't believe so.

Q.   Okay.  And the only lenders that are getting rolled are

which lenders?

A.   GE.  The bank group that is being agented by GE or other members of that bank group.

Q.   Okay.  Are you familiar with the concept of a lease reserve?

A.   Yes.

Q.   And what is your understanding of that?

A.   That -- gosh, I believe that we have 11 weeks before we are required to do so.

Q.   Right.  And they can take a reserve at that point?

A.   (No verbal response.)

Q.   Have you seen that in other retail deals?

A.   Yes.

Q.   In your view, are the fees that is being paid for this facility market?

A.   Yes.  It's within the range market.  Yeah.

Q.   And do you think that better -- let me strike that -- do you think financing on better terms is currently available?

A.   No, not based on our investigations and discussions.  I believe that we had fairly exhaustive conversations with other parties and could not come up with anything better and, you know, I believe that looking where we ended up from where we started on this facility is dramatically better.  So, no, I don't believe that we could have gotten better terms.

Q.   Mr. Weinsten, in your view, is it in the best interest of the company to assume the agency agreement?

A.    Absolutely.

Q.    Why?

A.    Because the -- A, there'll be a cost if you don't.  B,
there's -- it's providing liquidity for the business.  And,
again, if you look at the -- you look at the guaranteed
amounts.  If you're getting the sharing piece, which we're
hopeful we will receive, but holding that aside, even at just
the guaranteed levels, the proceeds we're receiving from the
sales pursuant to the agency agreement are greater than what
we could borrow under our existing facility.  So we are
creating availability for the company.  B, we are getting out
of stores that are not really part of the strategic future of
the business.  So from both those standpoints, I think it's
critical that we assume this agreement.

Q.    In your view, assuming this agreement versus a week from
now having a hearing on this agreement, can that have a
liquidity other than the 30 basis points?  Are there other
financial effects that it could have on the company?

A.    Yeah, I mean, we'll be sitting -- if we were not going
through this process right now, you know, we would have a
bunch of stores that are underinventoried and, you know, at
the end of the day you end up costing us some money.  And so
you're just stretching out the period of time for which we
want to get out of these stores and the sooner we get out of
them, the better, because we're going to reduce expenses and

1  really alter the footprint of the business.  So I think every

2  week's delay is costing the business -- costing the company

3  aside from the deductions, you known the three-tenths of a

4  point deductions.

5  Q.    So with respect to expenses, there's a possible impact on

6  expenses.  Could you explain that?

7  A.    Yeah.  The longer it takes to stay out of the stores, we

8  have to continue to pay rent and we're not doing it

9  efficiently as possible.  In any standard liquidation, you

10  know, there's a balance of how quickly -- you know, you try to

11  do it as quickly as possible while maximizing your margins and

12  if we're stretching out the process and not getting any margin

13  benefit, then clearly we're spending more on both payroll and

14  rent than we would otherwise need to to get out of these

15  stores.

16  Q.    Does that also have effect on the sharing?

17  A.    Absolutely, because we need to hit certain thresholds.

18  As I mentioned earlier, we have to hit the guaranty amount,

19  then we have to hit the 3-1/2 percent fee before we kick in

20  sharing.  If the proceeds generated from the sale, net

21  proceeds, get reduced because our expenses are higher, we will

22  not get to the sharing amounts, which could be meaningful.

23  Q.    And, again, in your view, is the entry into the DIP in

24  the best interests of the company?

25  A.    Absolutely.

1  Q.    Why?

2  A.    Couple reasons.  One, it's providing us with incremental

3  availability that we do not currently have and, yes, while we

4  do have availability, we do not have enough without the DIP to

5  fund the reorganization we're contemplating.  So that's number

6  one.  Number two is, it's important for the company to

7  demonstrate to its vendor community, who has not been shipping

8  to the business, that we have ample liquidity and ample bank

9  support to finance these purchases and a DIP is a very strong

10  message to that community to get the goods flowing again.  And

11  so I believe it's in the best interest.

12  Q.    And, again, I may be redundant but are the 29 stores

13  adequately stocked right now with inventory?

14  A.    Absolutely not.  They're 30 to 40 percent

15  underinventoried.

16  Q.    And will the DIP allow you to stock -- will the DIP allow

17  the company to stock those stores?

18  A.    Yes, it will.

19  Q.    And how does it stand on seasonal merchandise right now?

20  A.    Very far behind in seasonal merchandise.

21  Q.    And will the DIP allow liquidity to stock with seasonal

22  merchandise?

23  A.    Yes, it will.

24  Q.    Including, I think you mentioned fishing and --

25  A.    Fishing, and it's turkey hunting season.

1  Q.   Turkey hunting season?

2  A.   Yes.

3  Q.   I would ask you about the amount of effect but I have no

4  further questions at this point.

5        MR. GALARDI:  If I may, Your Honor --

6        THE COURT:  Any cross?

7        MR. GALARDI:  Some further questions just to

8  clarify.

9        THE COURT:  Very good.

10 BY MR. GALARDI:

11 Q.   The Gordon Brothers piece, is that being rolled?

12 A.   There's no pay down on it whatsoever, if that's what

13 you're asking.  It's becoming rolled into the DIP facility but

14 there's no pay down.  No.

15 Q.   Now if GE alone reduced its block, I think you said from

16 15 to 5, what effect does that have on the Gordon Brothers

17 piece?

18 A.   It allows more debt to be borrowed ahead of them, up to

19 $10 million more.

20 Q.   So does that have the effect -- in effect, subordinating

21 GB's recovery sooner?

22 A.   By $10 million.

23 Q.   Okay.

24 A.   Up to 10 million.

25 Q.   And was there some dispute between GE and GB about doing

1  exactly that in the negotiations?

2  A.    Yes.

3  Q.    And could you just describe the two DIPs that were

4  offered by those two parties?  Well, let me ask you this

5  question --

6  A.    Well, the GE DIP, I've explained, the Gordon Brothers DIP

7  basically -- Gordon Brothers was going to provide up to $10

8  million of incremental liquidity through a subordinated DIP.

9  If I recall the terms correctly, it would be subordinated to

10 GE's existing facility as well as Gordon Brothers existing 16

11 million and the company would be able to access it on an as

12 needed basis.

13 Q.    And there would have been a fee for that; correct?

14 A.    Yes, there was.

15 Q.    And in your view is the $750,000 fee appropriate as part

16 of the adequate protection for Gordon Brothers?

17 A.    Yes, it is.

18 Q.    And why is that?

19 A.    Because they're being -- I mean, they're being

20 subordinated up to $10 million.  They're staying in the

21 facility and they are also willing to let us go for an

22 extended period of time.  Let me restate that.  They're

23 allowing us to have milestones that are set out far enough to

24 allow us to reorganize.  So when you add all that up and the

25 inherent risk in extending a process, they are entitled to

1  750.

2  Q.   And has Gordon Brothers also provided a term sheet for an

3  exit facility?

4  A.   Yes, they have and that is also I think contemplated as

5  part of the fee that they're being paid.

6       MR. GALARDI:  No further questions.  Now again, at

7  this point, I need one more further question.  Your Honor, if

8  I may approach the witness.

9       THE COURT:  Okay.

10 BY MR. GALARDI:

11 Q.   Mr. Weinsten, I've just -- could you identify the

12 document I just handed to you?

13 A.   This is the agency agreement and the amendment to the

14 agency agreement.

15 Q.   And I had it opened to a certain page.

16 A.   Yes.

17 Q.   First question is, under the Gordon Brothers deal, what

18 is the actual agent's fee that you see there?

19 A.   Here, it's 76.9 but as I alluded to earlier, the original

20 price was 77.6 and there was a cost to giving the four stores

21 to UFA and taking them out of the Gordon Brothers deal.  So

22 the difference between the 77.6 and the 76.9 actually reflects

23 the removal of those four stores.

24 Q.   That's the guaranteed amount; correct?

25 A.   Yes.

1   Q.   Now let's read the agency fee.  I think your testimony

2   was it was 3.5 percent.  Was that the Hilco agent fee?

3   A.   No.  Hilco -- actually, theirs is -- actually, you know

4   something, it's 3 percent here.

5   Q.   Correct.

6   A.   Okay.  I misspoke.  You know, I apologize.  The original

7   deal was 5 percent, we negotiated 3-1/2 percent and we finally

8   settled on 3.  So that's my mistake.  We did take it down that

9   half percent.

10  Q.   And then the final part, if you read down below that

11  paragraph, it's 30 basis points per day; right?

12  A.   Yes.

13  Q.   And the order had to be entered by March 20th?

14  A.   Yes.

15  Q.   So 21st, 22nd, 23rd.  We're in the third day?

16  A.   Yes.

17       MR. GALARDI:  Now, I think I have no further

18  questions, Your Honor.

19       THE COURT:  All right.  Any cross?  Mr. Klauder?

20       MR. KLAUDER:  Thank you.

21                    CROSS-EXAMINATION

22  BY MR. KLAUDER:

23  Q.   Good afternoon, Mr. Weinsten.  My name is David Klauder

24  with the Office of the United States Trustee.  Just hitting on

25  that point, that last point there by Mr. Galardi.  If you take

1  a look at the budget, has the budget -- where can you point to

2  would be the liquidator fees?

3  A.    You don't see a liquidator fee in the budget because this

4  is a guaranteed deal.  So they're not entitled to a fee until

5  after we've hit the guarantee and so, therefore, you only see

6  the guaranteed payments in here.  We make no assumption on

7  sharing.  Therefore, there is no reason to put the fee in

8  here.  We only include the 76.9 minus whatever we eventually -

9  -

10  Q.    So that 3 percent fee that we've been talking about isn't

11  reflected in here?

12  A.    No, there's no reason to put it in.

13  Q.    I just want to quickly talk about the timing of the

14  auction with regard to the liquidators.

15  A.    Sure.

16  Q.    Trying to put some more specificity to that.  You had

17  testified that in the beginning of March the Debtors decided

18  to close certain stores?

19  A.    Yes.

20  Q.    Okay.  And that would be what we're discussing here, the

21  23 stores?

22  A.    27.

23  Q.    Well, 27 at that time frame.  So would that be the first

24  few days of March?

25  A.    Yeah.  It was in and around that time frame.

1  Q.   And do you recall when the -- you said bids went out to

2  six or seven liquidating firms?

3  A.   Yes.

4  Q.   Do you recall when that was?

5  A.   Well, let me take a step back.  It could have been the

6  end of February as well.  I don't want to misspeak.

7  Technically, we didn't submit bids.  What we did is we set up

8  a data room at the company that had all the relevant

9  information and then some time the end of February, perhaps

10 early March, we sent letters to each of them saying that the

11 data room was open and we would like you to bid on this.

12 Q.   Do you recall when the auction was?

13 A.   Yes, it was on a Saturday night.  It was the first

14 Saturday night of March, whatever that date is.  What is it,

15 do you know?

16 Q.   March 7.

17 A.   March 7.  That's correct.  From 5 to 9 mountain time.

18 Q.   And the winning bid was selected that night?

19 A.   Yes.

20 Q.   And I believe you said the store closings began March

21 10th, March 11th?

22 A.   Somewhere around there.  Yes.

23 Q.   And so in that period at some point, between March 7th and

24 March 10th, March 11th, the agency agreement was negotiated and

25 signed?

A.   Well, the final elements -- remember, we had a stalking-
horse bid that most of the terms were already agreed upon.
So, yes, there were some final discussions on certain elements
but that's when it was finalized.

Q.   Was the reduction of price per day term, was that in the
original stalking-horse?

A.   I don't recall.

Q.   Was that in -- was that something the Debtors negotiated?

A.   Yeah.  It was definitely in that agreement by the time
the sales commenced.  I just don't remember what point they
went in.

Q.   Well, do you recall a negotiation over that term?

A.   I actually wasn't involved in that specific negotiation.

Q.   And when is it contemplated that the store closings would
be done?

A.   Ideally in May.

Q.   Any specific time period in May?

A.   I mean our model assumes they go through May but, you
know, the sooner the better.  So if it could be done by the
beginning of May, the better.

        MR. KLAUDER:  I have no further questions.

        THE COURT:  Anyone else with cross-examination?  Mr.
Collins?

        MR. COLLINS:  Good afternoon, Your Honor.  For the
record, Mark Collins, Richards, Layton & Finger, on behalf of

1  Seidler.  Your Honor, just a few preliminary comments to

2  determine whether I do need to go into cross-examination of

3  Mr. Weinsten.  We are -- Seidler is very supportive of the

4  company, do believe that this company has the ability to

5  reorganize or to sell itself as a going concern.  We do,

6  however, have a number of concerns regarding the DIP credit

7  agreement, including the proposed fees to be paid to GE and to

8  GB Merchant Partners.  And, more importantly, the time line

9  set forth in the credit agreement at 9.1(R), which is as Mr.

10  Weinsten testified, the various deadlines for the filing of a

11  plan, approval of a disclosure statement and the date by which

12  it goes effective.

13       Prior to the hearing, I had an opportunity to talk with

14  Mr. Neier and Mr. Antoszyk.  I believe we have agreement that

15  those issues can be tested again at the final hearing.  In the

16  meantime, Seidler will continue to talk with the Debtors and

17  the Lenders about those time lines and the like.  And I don't

18  want my silence here today to be used against me at the final

19  hearing when I may very well be here objecting to the time

20  line, to the fees and the like.  And with that agreement on

21  the record, I will not cross-examine today but reserve my

22  right to do so in full at the final hearing.

23       THE COURT:  All right.  Is that all right, Mr.

24  Neier?

25       MR. NEIER:  David Neier on behalf of GE

1  Capitalization.  I guess so, Your Honor, because there's going

2  to be a lot of borrowing between now and the final hearing and

3  clearly there'll be something earned in terms of fees.  I'm

4  sure the Court can hear the testimony and make a determination

5  with respect to the fees.  With respect to the planned

6  deadlines, none of them are going to come up during -- or

7  shouldn't come up between the interim and the final order.  So

8  they're fully able to be tested.

9       THE COURT:  All right.  Mr. Collins?  I'm sorry, Mr.

10  Galardi?

11       MR. GALARDI:  From the Debtors' perspective, the

12  only reason I put the testimony is so that we're all aware

13  that we are not trying to get approval on any final basis.

14  That was the agreement of the parties and all right to reserve

15  to argue should be longer times or whatever come final

16  hearing.

17       THE COURT:  All right.

18       MR. COLLINS:  And, Your Honor, with respect to Mr.

19  Neier's comments regarding the fees, obviously there will be

20  some fee imposed for the borrowing over the coming 20 to 30

21  days but it may very well be that at the final hearing, if

22  there's objections by the Creditors' Committee or Seidler that

23  looking at the projections, which show this Debtor being cash

24  flow positive over the entire 13-week budget, Your Honor may

25  determine that the continued DIP lending and the like is not

1  necessary and as a result Your Honor could fashion the

2  appropriate fee.  So it's really just -- I thought we had that

3  agreement, that the fees could be subject to consideration by

4  Your Honor at the final hearing.

5          THE COURT:  I think they would be.  I think

6  everything's open for reconsideration.  As a matter of fact,

7  just yesterday I did, I think for the first time reject a

8  final order on a DIP, basically because it was unnecessary.

9  So that's all on the table.  You get your fees back when you

10 win your 506(c) Surcharge Motion, Mr. Collins.

11         MR. NEIER:  Your Honor, I don't know if anybody else

12 wishes to cross-examine the witness.

13         THE COURT:  Okay.  Do you?

14         MR. NEIER:  I do not.

15         THE COURT:  Oh, okay.  Let me ask Mr. Galardi if

16 he'd like redirect.

17         MR. GALARDI:  Just a clarification and I may be

18 stepping in some --

19                    REDIRECT EXAMINATION

20 MR. GALARDI:

21 Q.   Mr. Weinsten, if you'd look at the budget, you'll see the

22 cash flows liquidating inventory sales.

23 A.   Yeah.

24 Q.   You were asked the question by the U.S. Trustee whether

25 there is anywhere in this budget that reflected the fees but

1  can you explain how that liquidating inventory sale number was

2  put together?

3  A.    Sure.  What we did is we made assumptions as to what we

4  thought the cadence, in other words, the markdowns, and how

5  quickly they would come, when they would come.  We made an

6  assumption as to what's called a sales multiplier.  So when

7  you have a liquidating sale, you assume you're going to get

8  some multiple of the sales over the prior year because you're

9  saying you're going out of business in that store.  So we made

10  those assumptions.  So then when you take the inventory that's

11  in those stores and you assume the sales multipliers for these

12  weeks, when you have the markdown cadence in these weeks, we

13  came up with a sales flow but at the end of the day working

14  back to that guaranteed payment.

15  Q.    And do you know if this requests a guaranteed payment of

16  a certain percentage?

17  A.    74.8 percent.

18  Q.    But that's lower than in the agency agreement and assumes

19  some conservative estimate there?

20  A.    Correct.

21  Q.    Thank you.

22  A.    Actually, just one point of clarification in case it

23  comes up.  And also we are -- because this is an equity type

24  deal or a guarantee deal, we're being reimbursed for expenses

25  in those stores and that's reflected in the receipts as well.

1  Q.  Thank you.

2       MR. GALARDI:  No further questions, Your Honor.

3       THE COURT:  All right.  You may step down.

4  (Witness excused.)

5       MR. GALARDI:  Your Honor, I guess we're being asked

6  -- how would you like to proceed?  We can argue on both the

7  motions.  I know Your Honor has a very strong view but we can

8  do the DIP first.  I know Your Honor has a strong view about

9  store closing sales on First-Day, as I learned one time.  So I

10 can argue that, go through what we've done to this date.  How

11 would Your Honor like to proceed?  I have no further witnesses

12 on either Motion.  I don't think we need them.

13      THE COURT:  Are there any pending objections?

14      MR. GALARDI:  Your Honor, I think the U.S. Trustee

15 has a basic objection to the agency agreement being assumed on

16 the First-Day.  So I might want to just address what we've

17 done to get here and why we think it's appropriate on that

18 one.  As to the DIP objections, I believe Mr. Collins, the

19 U.S. Trustee and we have worked out language, although it has

20 to be embodied in an order.  We are working on a form of order

21 plus whatever Your Honor may have seen in the order.  Probably

22 Mr. Collins caught most of it but we'd like to go through

23 that.  With respect to the agency agreement, I don't know of

24 any pending objections but just other than the U.S. Trustee's

25 objection but, Your Honor, I think it's important for the

1  record to know certain notice and what we did with respect to

2  the agency agreement to get here.

3  THE COURT:  All right.  If you'd like.  Most of this

4  was under direct; wasn't it?

5  MR. GALARDI:  It was but I think you should know

6  about the AGs and the landlords and the service on those

7  parts.

8  THE COURT:  Oh, very good.  The service issues.  I

9  apologize.  All right.

10  MR. GALARDI:  That's really -- Your Honor, with

11  respect to the AGs, Your Honor, as you know, we filed on

12  Saturday evening and the store closing Motion itself, not just

13  notice but the Motion, the agency agreement was sent to the

14  AGs that are affected in the closing markets.  Although I

15  tried to contact Ms. Karen Cordry on Wednesday, Thursday and

16  Friday, we finally touched base again with Hilco's -- with

17  Gordon Brothers' counsel and Mr. Cohen, who is in the

18  courtroom, and had a long discussion with Karen Cordry.

19  Again, she's at the National Association of Attorneys General.

20  She's not specifically representing them.

21  The order that we would like to present to Your Honor

22  today reflects our preliminary agreement.  We think we've

23  resolved all of our objections for the time being but think

24  it's important to point out, one, as Your Honor has already

25  pointed out on a number of occasions, the order that would

1  approve this would be still an interim order; and, two, with

2  respect to even the sale guidelines which landlords would be

3  prejudiced by, it specifically provided a ten-day notice to

4  come in and object to that.  We've added -- we've also added

5  the AGs to that provision.  So we think we've satisfied

6  outstanding objections concerns with Ms. Cordry.  Again, we

7  made the order interim for the purpose of the AG still coming

8  in and raising any sort of objections.

9      With respect to landlords, Your Honor, I guess I call

10  them in Circuit City the landlord (indiscernible) contacted

11  Mr. Tucker, Mr. Ivan Gold, Mr. Pollack (*ph*), Mr. Lahane (*ph*)

12  and Mr. Dustin Branch before this case, seven days before,

13  gave them a heads up of what was going on filing the case.

14  Mr. Lahane and Kelley Drye as represented here, we ultimately

15  -- he was retained by many of the landlords.  We have I

16  believe worked out the landlords' objections to the sale

17  procedures or side agreements.  There may be landlords,

18  obviously, that aren't represented in that but I did want your

19  Your Honor to know that in addition to what I'll call the

20  Saturday to Sunday notice, at least two of the major

21  constituencies, the National Association of AGs as well as a

22  landlord who is fairly sophisticated, as you commented, they

23  might as well buy an apartment here recently, seeing these

24  guidelines and seeing the order, they have had an opportunity

25  to comment on that order and Gordon Brothers has negotiated a

1   consensual order with them.  So I thought that was important

2   for this record.

3          MR. KLAUDER:  Thank you.  And I appreciate Mr.

4   Galardi's comments.  We've talked about a lot of this this

5   weekend as well.  One thing I want to note, which is related

6   to the agency agreement and the notice, but just general

7   notice in particular -- I'm not saying anything that will

8   surprise Mr. Galardi because we had a nice discussion about

9   this Friday night.  This case was filed on Saturday morning I

10  believe.  We took the position with Mr. Galardi Friday night

11  that we believe that that was in -- having a Monday hearing

12  was in violation of the local rule that provides for 24-hour

13  notice.  We take the position that that's a business day

14  notice, so we're concerned about notice.  I'm certainly not

15  standing up here.  I would have done so in the beginning of

16  the hearing if we had an objection with the hearing going

17  forward.  That was a concern of our office and continues to be

18  and I could directly point then to the agency agreement.

19  While Ms. Cordry, who I had an e-mail discussion with, has

20  provided her comments, there are still specific state AGs who

21  I'm sure did not get notice of this proceeding until this

22  morning, if they did.  There is concern there.  Your Honor has

23  heard us before dealing with this.

24      This seems to be the MO now in these retail cases, where

25  the store closings begin before the case was filed.  You have

1  the liquidator chosen and go through all that process, and it

2  kind of puts the Court in a difficult position I understand on

3  the First-Day with the Debtor arguing that certain things that

4  will prejudice the Debtor, for instance, the $150,000 a day

5  here, if Your Honor doesn't approve that, but it's a concern

6  that this is the way it's kind of going now.  We sit here on

7  the First-Day when it's supposed to be immediate and

8  irreparable harm, an issue that doesn't just involve our

9  office.  It involves landlords, it involves state AGs and it

10 involves the Committee.  That's one entity that we haven't

11 discussed here today, the Creditors' Committee.  I'm sure they

12 would want to have involvement in this deal, the economics of

13 this deal and so forth, and I haven't heard Mr. Galardi at

14 least indicate what that interim means as it relates to them.

15 Everything's up for grabs again and maybe it's not that big of

16 a deal but I'm not so sure that that's the case.  So we have a

17 concern.  We are objecting to the approval of it today.  And,

18 again, this is something -- it's been a concern.  We've seen

19 it in other cases.  I've argued this and I don't think I've

20 argued it in front of Your Honor but I've argued it in front

21 of the other judges before and certainly seems to be the

22 trend.  Thank you.

23          THE COURT:  You're welcome.

24          MR. GALARDI:  Your Honor, just briefly.  On the 24-

25 hour rule, I think the U.S. Trustee's position would mean that

1    any case filed after Friday at 3 o'clock couldn't be heard

2    until Tuesday.  That's clearly not what the local rule was

3    intended to do.  We believe 24-hour notice is notice, though

4    preferable not to do it over the weekend, and this is not a

5    public company that will hamper the filing, and I think I put

6    forth in the letter that we don't read the 24-hour rule that

7    way.  I'll be sure when I go back to the Local Rules Committee

8    to make sure it doesn't read that way in the future.  But we

9    actually think it's appropriate in this circumstance because

10   we actually did give notice and have reached out.  And because

11   of the concerns with the AGs and other landlords, we've made

12   it interim.  So let me get to what I think that means.

13       Your Honor, we have styled it as the assumption of a

14   contract.  The assumption of a contract is the business

15   judgment of the Debtors.  So with respect to being able to

16   retain the agency agreement provision and having Gordon

17   Brothers serve it, that's a business judgment decision and I

18   haven't seen parties successfully object to the assumption

19   where there's really no cost for the assumption in this case.

20   Indeed, we get back the retainer aspects, we get to go forward

21   on an agreement and we get to make money.  There's not a cure

22   here that's of any significance.  Indeed, the liens go away

23   and all the provisions are important.

24       With respect to what's interim, I think what we've done

25   is taking care of what I think are the standard concerns for

landlords and AGs.  They have the right to come in here and
object to the provisions of that order.  If they think that
we've overridden their laws and ordinances, they have the
right to do that.  With respect to landlords, if they have
lease issues, they have rights to do that.  Your Honor's been
involved in many store closing sales.  Most of the issues are
banner signs, all of that.  That's all preserved for the
landlords.  As to the AGs, it's -- can we have, you know, side
street walkers -- I wouldn't say street walkers, whatever they
are, side walkers, signs, banners, can you get in the way of
the parking lot.  All of those rights -- do you need permits.
All of those rights had been preserved in this order subject
to come back to Your Honor.  Fortunately, you end up not
fighting most of those issues because they work by side
agreements or they come in.  So we think we've addressed all
of what I'll call the bigger concerns.

     And, Your Honor, it may be de jure but the fact of the
matter is, unfortunately, because of the kinds of time frames
that realtor Debtors now face, to file a motion, to seek a 20-
day notice, and even where Your Honor gave me seven days
notice, I wouldn't have had that without an ad hoc committee.
The difference between say this and Goody's is, we didn't have
an ad hoc committee because we have Mr. Collins who has a
large creditor here, but more importantly, to have an ad hoc
committee ten days or 15 days when we're trying to play the

1  game, as Your Honor heard the testimony between UFA and

2  getting this deal done, it just didn't make sense because we

3  would have lost some of the vendors.

4  Second, to wait 20 days or even seven days to have the

5  auction to do the sales, we would have lost too much time in

6  this case.  And so we just thought it was more important to,

7  one, for the strategic reasons, conduct the auction prefiling;

8  two, structure it as an assumption of a contract, which is

9  business judgment; and, three, give the other parties that are

10  most affected by this, not the unsecured creditors because

11  there was an auction, but really the AGs and the landlords

12  interim relief so they have all their rights preserved and

13  make that express and also try to reach out to the people who

14  we know always show up in Court with those concerns and get

15  their comments.  So I think the notice is adequate.  Again,

16  it's an interim order and we'd ask Your Honor to approve it.

17  THE COURT:  Thank you.  Well, every case is unique

18  and depends upon the facts and circumstances of the case.

19  It's clearly the Court's preference not to take this type of

20  action on the First-Day of the case and, indeed, the

21  bankruptcy rules have been amended to not allow, for instance,

22  for the assumption of executory contracts on the First-Day of

23  the case absent irreparable harm.

24  I think the reality of the business environment in which

25  retailers find themselves in 2009 is such that the business

reasons for seeking this type of relief are probably no more intense -- or excuse me -- have never been more intense in my professional career. That doesn't mean I don't care about due process. Obviously, I care very much. But I think Mr. Galardi has ably argued that the effects of doing this on day one are to the estate are marginally -- are positive -- excuse me. And the chance that they are not positive is very small.

I don't think there's going to be any doubt that these stores, I expect, need to be closed. I can't see a committee having issue with that. And store closings have begun. It's hard to fault the Debtor for adequately planning ahead to get the store liquidations done. It may become more and more of a trend and like I said, every case is unique and a record certainly needs to be made to justify this relief, which is extraordinary. But I think the record's been made in this case and I think the notice was adequate. I won't comment about the 24-hour rule because it's not being pressed by the Office of the United States Trustee. I prefer not to read binders on Sunday but, you know, it is what it is. So I will overrule the objection and approve the order -- excuse me -- the Motion on the agency agreement. I guess we should turn pages on the order. And in connection with the DIP financing, I don't know -- it sounded like there was no objection that hadn't been resolved. So, again, subject to turning pages on the order, I'll approve that as well.

1    MR. GALARDI:  Your Honor, I think Mr. Neier or

2    probably Mr. Collins -- I'll let them read -- I don't know if

3    Your Honor had other comments but if you wanted to go through

4    some of the black-line changes for the record, I think that

5    will also make Mr. Collins uncomfortable --

6    THE COURT:  Do you have --

7    MR. GALARDI:  If I might hand up the agency

8    agreement with a black-line behind it, you'll see some of

9    those changes that we have made.

10    THE COURT:  Okay.  You have the DIP, too, DIP

11    agreement, too, DIP order black-line?

12    (Counsel approaches.)

13    THE COURT:  Thank you.

14    MR. GALARDI:  Your Honor, just to point out some

15    significant things about the agency agreement, I think there

16    was a hearing before another judge in Boater's and Ritz

17    Camera, so we've got language on latent defects, which Ms.

18    Cordry ask we not change our refund policy, and there are our

19    clarifications that she had asked for that are in those

20    orders.  So we do appreciate her.  I'm sure she too feels like

21    it would be better not to work on Saturdays.  We got that

22    complete impression, and Sunday morning and Monday morning.

23    But we appreciate her efforts to give us all those comments

24    and I'm pleased to say that they are resolved, at least on an

25    interim basis subject to the other AGs making comments.  I'll

1   let Mr. Neier work through the black-line of the DIP.

2          THE COURT:  Which one do we want to start with?

3          MR. NEIER:  Your Honor, you know, in addition to the

4   business environment for retailers, I would say this case is a

5   little different than other retailers and that we've got a

6   part sale, part closing, a part reorg.  So there have been a

7   lot of things that have changed in the DIP.  What we've done

8   is we've circulated the order to all the various parties in

9   interest as much as we could.  And the DIP changed primarily

10  because of comments by the Debtors.  Intercreditor issues

11  between Gordon Brothers and GE and GE's participants in their

12  loan, the U.S. Trustee's Office, landlord comments and other

13  comments from other parties.  And we prepared the black-line

14  to the file version, probably the version you saw over the

15  weekend, and we can go through those comments but in addition

16  to those comments, as we walked into court today, Mr. Collins

17  handed me a whole new set of comments and there were three

18  comments I think in addition by the landlords or by at least

19  some of the landlords.  So we can sort of walk through the

20  comments, if you wish, or we could just walk through the

21  changes to the black-line, whatever you prefer.

22          THE COURT:  Well, let's walk -- well, let me look at

23  --

24          MR. GALARDI:  He hasn't seen the black-line.

25          MR. NEIER:  Right.  I understand.

1          MR. GALARDI:  Your Honor hasn't seen the black-line.

2     So I think it's probably --

3          THE COURT:  Let's walk through the black-line and

4     you can give me the summary of the other changes.

5          MR. NEIER:  Right.  The first change appears on page

6     2 but it's just to refer to things that happened later.

7          THE COURT:  Okay.

8          MR. NEIER:  So I'm going skip over the

9     nonsubstantive changes, if you will.

10         THE COURT:  Sure.

11         MR. NEIER:  The first substantive change I believe

12    is on page 10 of the black-line.  This was a change requested

13    by the landlords and I'll just read it.  It says, "Provided,

14    however," and then I'm going to add a couple of comments that

15    were given to me this morning or this afternoon.

16         THE COURT:  Okay.

17         MR. NEIER:  So I'll read it with those comments

18    inserted.  "Provided, however, until entry of a final order

19    providing for such relief, DIP liens and DIP collateral shall

20    not include liens on nonresidential real property leases

21    unless such leases are subject to valid prepetition liens.

22    But for the avoidance of doubt, DIP liens and DIP collateral

23    shall include all proceeds from such leases."

24         THE COURT:  Okay.

25         MR. NEIER:  And I believe the next change would be

1    on page 16, and a lot of these changes from Mr. Collins are

2    what I would call for the "avoidance of doubt changes." This

3    is one of them. About halfway through the page, there's a

4    sentence that says, "None of such fees, costs and expenses

5    payable pursuant to this paragraph shall be subject to

6    separate approval by this Court." These are lender fees. Mr.

7    Collins and GE have agreed to say, "None of such legal and

8    advisory fees shall be subject to approval of this Court." Of

9    course, the fee letters or the --

10             THE COURT: Right.

11             MR. NEIER: -- fees will be subject to approval. On

12    page 17, at the end of paragraph 12, we've also added "For the

13    avoidance of doubt that with respect to fees of the lenders,

14    it will be subject to the other provisions of this interim

15    order regarding such fees and expenses," which is -- there's a

16    window for the U.S. Trustee and other parties in interest to

17    object to the lender fees.

18             THE COURT: Okay.

19             MR. NEIER: And then below that, on paragraph 12, in

20    the black-line, one, there's been an insert for the Gordon

21    Brothers fee letter, which Mr. Weinsten testified to, and also

22    a reference to Section 9.1(A) of the intercreditor agreement,

23    which sets forth various different priorities with respect to

24    Gordon Brothers and GE. And it also refers to the priorities

25    set forth in this order.

1        THE COURT:  Okay.

2        MR. NEIER:  And on page 12, there are additional

3   changes, really all intercreditor changes.

4        THE COURT:  Page 18.

5        MR. NEIER:  Sorry.  Page 18, end of paragraph 12.  I

6   apologize.

7        THE COURT:  That's all right.

8        MR. NEIER:  Which is to confirm that the definitions

9   of the borrowing base and the alternative borrowing base,

10  which are set forth in the DIP creditor agreement, cannot

11  change without the approval of Gordon Brothers.  And the next

12  change would be on page 20, which is a change requested by the

13  U.S. Trustee's Office.  After confirming that the maximum part

14  of the carve-out is 4.5 million, it provides that the U.S.

15  Trustee fees and other fees payable to banks and court shall

16  come first out of that $4-1/2 million maximum carve-out.

17       The next change is on page 24 at the end of paragraph 16.

18  We've struck some language that would have required

19  prepetition agents to turn over their documents to the DIP

20  agent for use in collecting on collateral.  Once again, an

21  intercreditor issue.

22       The next change is a handwritten change on page 26 in

23  17(c) requested by Mr. Collins.  We're making clear where it

24  says at the bottom, "That the foregoing admissions,

25  stipulations, agreements, releases and waivers in this

paragraph 17 are and shall be binding on the Debtors.  Any

subsequent trustee, responsible person, examiner with expanded

powers" we've added, "subject to the challenge" provisions in

paragraph 18(b) so that the U.S. Trustee -- I'm sorry -- any

chapter -- any subsequent trustee would also have the benefit

of any challenge that had been made by the committee during

the challenge period is the reason for the change.

THE COURT:  Okay.

MR. NEIER:  Next, in paragraph 19, also handwritten

changes not in the black-line.  19(d), about halfway through

the page, we've added again, "Subject to the provisions of

paragraph 18(b)," meaning the challenge provisions.  And then

just four lines from the bottom of paragraph 19 where it says,

"In each case with such parties' prior written consent given

in its sole discretion," we've added, "except notwithstanding

the foregoing, nothing herein shall prevent any party in

interest from objecting to the entry of a final order," as if

that needed to be said, but we've said it.

THE COURT:  Okay.

MR. NEIER:  On page 32 in paragraph 22(a) at the

very bottom of the page, where it says, "Subject to any

intercompany claim, whether secured or unsecured," we've

struck the word "secured."  And in footnote 5, we've made the

same change we made earlier.  So the footnote would read,

"Notwithstanding the foregoing, until entry of a final order

1 providing for such relief, adequate protection liens shall not

2 include liens on nonresidential real property leases unless

3 such leases are subject to valid prepetition liens. But for

4 the avoidance doubt, adequate protection liens shall include

5 liens on all proceeds from such leases."

6 THE COURT: Okay. What was the change before? I

7 can't find that? Not the footnote but I mean --

8 MR. NEIER: It should be the very last line on page

9 32.

10 THE COURT: Okay. You're striking "secured."

11 MR. NEIER: Striking "secured." That's correct.

12 THE COURT: Okay. Got it.

13 MR. NEIER: Change requested by Mr. Collins.

14 Paragraph 22(b) on page 33, we have struck the fact -- we

15 struck the idea that a 507(b) claim would somehow trump a

16 364(c)(1) claim. So we struck Section 364(c)(1) from that

17 section. And then in 22(c), at the very beginning where it

18 says, "adequate protection payments," we've written once

19 again, "subject to paragraph 18(b)," meaning the committee

20 challenge provisions.

21 THE COURT: Right.

22 MR. NEIER: And below, in the very last line, it'll

23 be, "None of such legal and advisory fees shall be subject to

24 separate approval by the court."

25 THE COURT: Okay.

1    MR. NEIER:  And then once again halfway through the

2    page where it says, "In any event, any adequate protection

3    payment," just before that, we said, "Subject to 18(b),"

4    meaning the committee challenge periods.  And this is a

5    section which previously said, "Any such amounts after they're

6    subject to challenge would be -- would first go to pay the

7    DIP."  Instead of saying, "shall not be repaid," and instead

8    we struck that language.  So the sentence now reads, "Subject

9    to paragraph 18(b), in the event any adequate protection

10   payment would be required to repay to the Debtors as a result

11   of the application of Section 506(b) or otherwise, any amount

12   shall be applied to outstanding obligations as follows:

13   First, to the DIP obligations until such obligations are

14   indefeasibly paid in full in cash on a final basis; and,

15   second, to the prepetition obligations until such obligations

16   are indefeasibly paid in full in cash on a final basis."  And

17   then we've added, "and, third, return to the Debtors and their

18   estates."

19         THE COURT:  Okay.

20         MR. NEIER:  With respect to the next session, which

21   is entitled "insurance," still on page 34, we've simply

22   conformed this section to the DIP credit agreement, which is

23   Section 6.5 of the DIP credit agreement and we said that in

24   addition to GE as agent having the right to be named as an

25   additional payee under insurance and the insurance is

1    acceptable to the agent, the language now allows the same

2    rights to Gordon Brothers as the term loan agent.  So they

3    have the benefit of the insurance section of the DIP credit

4    agreement.  With respect to reports, the same language or

5    essentially the same concept is captured, which is that all

6    the reports that would be required to be provided in the DIP

7    credit agreement will also be provided to Gordon Brothers as

8    the prepetition term loan agent.  And they will have the

9    benefit of those reports and be able to say those reports must

10   be reasonably satisfactory to them as well.

11         In section 22(f), which appears on page 36, we've added a

12   new section which talks about real estate consultant which

13   says, "Within 20 days of the date of this order, the Debtor

14   shall file a motion to engage a real estate consultant who

15   shall be reasonably satisfactory to the prepetition agents for

16   the purposes of advising the Debtors in connection with the

17   potential marketing and sale of nonresidential real property

18   leases and within 20 days after the occurrence of the lease

19   assumption, reserve commence date," which is what Mr. Weinsten

20   testified about.  "The Debtors shall have retained a real

21   estate consultant who shall be reasonably satisfactory to the

22   prepetition agents and the DIP agent for the purpose of

23   advising the Debtors in connection with the potential

24   marketing  and sale of all nonresidential real property leases

25   not previously rejected by the Debtors."

1          THE COURT:  I think for both those sentences where

2    it says, "who shall be reasonably satisfactory prepetition

3    agents," I think you need to add, "and approved by the Court."

4    You can't --

5          MR. NEIER:  We'll make that change, Your Honor.

6          THE COURT:  You can't (inaudible) without approval,

7    just to make it clear.

8          MR. NEIER:  We'll make both of those changes, Your

9    Honor.

10          MR. GALARDI:  Your Honor, I don't want to disagree

11   but I think -- isn't this a default by me?  I just want to be

12   only obligated to file the Motion.  Other people may have an

13   objection to that.  I don't necessarily want to be in default

14   if Your Honor doesn't approve it.  I just have to make the

15   obligation.  I just want to make sure we're talking about the

16   event of default here, if I'm not mistaken.

17          MR. NEIER:  There's no event of default.  It's a

18   requirement.

19          THE COURT:  It's a requirement.  It's not event of

20   default.

21          MR. GALARDI:  Well, it's a requirement that I file a

22   Motion.  You're making it a requirement not only that I file a

23   Motion but that you approve it.  It's an extra thing.  I mean,

24   I may file a Motion, the committee may object.

25          THE COURT:  Let me look at it again.  Where are we

1  here?

2      MR. NEIER:  22(f) on page 36, Your Honor.

3      THE COURT:  I lost my place.

4      MR. GALARDI:  I don't mind having an interim order -

5  -

6      THE COURT:  Hang on.  Let me read it.  Let me read

7  it.  Well, the first is -- you're right.  The first sentence

8  deals with filing a motion.  The second sentence says

9  "retained."

10     MR. NEIER:  I think that's a mistake, Your Honor,

11 and we'll fix that and make it "file a motion."  So it's

12 similar to above.

13     THE COURT:  Okay.  Well, then, you don't need to add

14 me.

15     MR. NEIER:  Okay.

16     MR. GALARDI:  You obviously have to approve it.

17     THE COURT:  I know.  Your point is well taken.

18     MR. NEIER:  With respect to paragraph 23, at Mr.

19 Collins' request, we've added or we will add, "Subject to

20 506(b) with respect to indemnification."  And later on where

21 it talks about indemnification, this is on page 37, about six

22 lines down, where it talks about indemnification, "paying the

23 expenses of the DIP agent and prepetition agent," we will say,

24 of course, "Subject to the provisions of this interim order

25 regarding payment of legal and advisory fees to the lenders."

1    THE COURT:  Okay.

2    MR. NEIER:  And then on page 39, I believe it's

3  25(a), "remedies of the DIP agent," when you work through this

4  entire paragraph, it's clear that there's -- before the DIP

5  agent can take any remedies or exercise any remedies, there's

6  a five-day window for people to come into court and stay the

7  exercise of remedies by the DIP agent.  But for the avoidance

8  of doubt, we've just said, you know, at the beginning of this

9  paragraph, "Subject to this paragraph 25(a)."  We've also --

10  this is an entirely new section which has been added just to

11  make clear of the rights of the DIP agent as to opposed to

12  rights of the prepetition agents, which comes later.  And

13  that's why there's a large black-line here.

14    THE COURT:  All right.

15    MR. NEIER:  It's really duplicate language.  We've

16  also added in 25(a)III, "that while the lenders can compel the

17  Debtors to file a Motion under 363 to sell their assets,

18  that's subject to the entry of the final order."  On page 41,

19  we've made it clear that the five-day notice period applies

20  not only to the Debtors but any other party in interest that

21  wishes to stay the exercise of remedies by the lenders.

22    THE COURT:  Okay.

23    MR. NEIER:  And below, the last sentence of 25(a)

24  where it says, "The parties acknowledge and agree that the

25  only issue to be determined and decided at a court hearing,"

1　we've struck "to be determined and decided at a court

2　hearing." And the sentence now reads, "The parties

3　acknowledge and agree that the only issue for the Debtors --

4　if the Debtors are in opposition, they exercise their rights

5　by the DIP agent/DIP lenders, is whether an event of default

6　or a termination event has occurred and is continuing."

7　　　　　THE COURT: So you're only limiting the Debtors?

8　　　　　MR. NEIER: Correct.

9　　　　　THE COURT: All right. Or you were going to lose

10　that sentence.

11　　　　　MR. NEIER: I know.

12　　　　　THE COURT: Okay. All right. That's fine.

13　　　　　MR. NEIER: 25(b), we've made exactly the same

14　changes that we made in 25(a), but these are the rights for

15　the prepetition agents as opposed to the DIP agent. And it

16　has the same five-day window allowing people to come into

17　court and stay the exercise of remedies.

18　　　Page 26 -- sorry -- page 44, paragraph 26, this is a

19　section that allows the DIP lenders and ultimately the

20　prepetition agents to access onto other parties' premises to

21　collect their collateral. We've made this -- if you look

22　towards the bottom of the page, page 44 and the top of page

23　45, we've said, "And further provided that until entry of the

24　final order, the DIP agent and prepetition agents, as

25　applicable, shall not enter into any leased premises of the

1  Debtors or any other party for the purpose of exercising any

2  remedy unless the DIP agent or prepetition agent, as

3  applicable, have the right to do so under applicable

4  nonbankruptcy law, obtain the consent of the landlord of such

5  premises; or, three," and three now has some handwriting

6  additions, "or the court after appropriate notice to the

7  landlords enters a separate order permitting entry onto such

8  premises," meaning that if they wish to do so, until entry of

9  the final order, we have to come back to this Court, get a

10  separate order on notice in order to exercise this right and

11  remedy.

12      THE COURT:  Could we change "appropriate" to

13  "adequate"?

14      MR. NEIER:  Yes.  Yeah.

15      THE COURT:  All right.  Okay.

16      MR. NEIER:  Paragraph 29 on page 46, there's another

17  handwritten change not in the black-line.  At the top where it

18  says, "survival," "the provisions of this interim order and

19  any actions taken pursuant hereto shall survive entry of any

20  order," and then we've added in parentheses, "unless modified

21  by further interim or final order," close parentheses.

22      THE COURT:  Say that again.

23      MR. NEIER:  What we've done, Mr. Collins thought

24  that somehow the interim order survives, and I think an

25  interim order does survive if it's not modified by a final

1  order.  It's just a binding order until the Court has a

2  hearing, makes a different order.  But we've simply confirmed

3  that.  The order survives until there's another order.

4          THE COURT:  Okay.

5          MR. NEIER:  Paragraph 31, top of page 48, this is an

6  intercreditor issue.  We simply said, "With respect to

7  amendments or modifications or waivers of the DIP credit

8  agreement, it's subject to the approval of the prepetition

9  agents and prepetition lenders," and it's explained elsewhere

10  in the agreement.  And in the -- towards the middle of the

11  page under 31(e), we've added, "Any other rights, claims or

12  privileges, whether legal, equitable or otherwise, of any of

13  the DIP agent, DIP lenders or prepetition agents or

14  prepetition lenders."  So there can't be any waivers, Your

15  Honor.

16          THE COURT:  Okay.

17          MR. NEIER:  Paragraph 32, we've made clear that the

18  budget -- you know, failure to comply with the budget is an

19  event of default but we said it's subject to the various

20  variances that have been agreed to elsewhere in this order.

21          THE COURT:  Okay.

22          MR. NEIER:  We've also added -- and just to be very

23  clear about what this says, if there's a -- after the GE is

24  paid off, so after the DIP loan is paid off, there's an event

25  of default, if prior to -- or there's an event of default if

1   at that time the Debtors and the prepetition term loan agent

2   haven't agreed on a revised budget.  And, of course, the five-

3   day window applies in that period too.  And then towards the

4   bottom, we've incorporated by reference a lot of sections of

5   the DIP credit agreement for the purpose of saying that those

6   also apply to the prepetition term loan agent, namely Gordon

7   Brothers, in addition to GE.

8            THE COURT:  Okay.

9            MR. NEIER:  And then in paragraph 35, it's really

10  just a language change but we've confirmed that we all have

11  the right to credit bid, that is, all the lenders do, various

12  priorities.

13           THE COURT:  I'm seeing that more and more.  What's

14  the point of putting that in the DIP order and not waiting for

15  the sale?  Just to have it buttoned up I suppose.

16           MR. NEIER:  And what's the point of stating what the

17  law already says but --

18           THE COURT:  Yeah, well, then this would be a two-

19  page order.

20           MR. NEIER:  Yeah.  Paragraph 37, Your Honor, just

21  confirms that the intercreditor agreement that exists between

22  the prepetition agents and lenders still exists.  And I think

23  those are all the substantive changes.

24           THE COURT:  All right.  Any other comments on the

25  DIP?  Mr. Saydah?

1    MR. NEIER:  Mr. Gwynne and I are going to occupy the

2    microphone, so nobody else can get to --

3    MR. SAYDAH:  Your Honor, Gilbert Saydah of Kelley

4    Drye on behalf of Hawkins Companies, Developers Diversified

5    Realty and Weingarten Realty Investors.  Your Honor, the

6    changes that Mr. Neier put forth on the record were correct.

7    Just for the record, Your Honor, as the DIP and the GOB, we're

8    sort of taking together, we had resolved our comments with

9    respect to the GOB pursuant to a separate side letter and

10   wanted to thank the Debtors for reaching out to us prepetition

11   to try and get those issues resolved.

12   THE COURT:  All right.

13   MR. SAYDAH:  Your Honor, I was hoping I could be

14   excused.

15   THE COURT:  Yeah, so was I.  Okay.

16   MR. SAYDAH:  Thank you very much.

17   THE COURT:  Just so the record is clear, it's a

18   store closing sale, not a GOB.

19   MR. NEIER:  One more change.  There was a section,

20   which I did put on the record, that said that the Debtors

21   cannot object except to say that an event of default has

22   occurred and is continuing and we had taken out the language

23   that said the court couldn't be locked up in that.  But we

24   also struck the committee from that section.

25   THE COURT:  Right.

1          MR. NEIER:  So if the committee wishes to object on

2     any grounds to an exercise of rights and remedies, they can do

3     so.

4          THE COURT:  That was my understanding.  Thank you.

5     Mr. Collins?

6          MR. COLLINS:  Yes, Your Honor.  Just a couple of

7     clarifications to Mr. Neier's comments.  Paragraph 19, my

8     version I think is a slightly -- the pagination is slightly

9     different but it's around page 30 on my document.  It's

10    paragraph 19.

11         THE COURT:  Okay.

12         MR. COLLINS:  In the added language that Mr. Neier

13    stated in paragraph 19(d), the purpose of my addition is that

14    the Creditors' Committee can be compensated for objecting to

15    the form of final order or appearing at the final hearing.

16    And that was the reason why we added in language that, "except

17    that parties can object to terms of the final hearing."

18         THE COURT:  Understood.  Okay.

19         MR. COLLINS:  On paragraph 23, this is the

20    indemnification paragraph.  In addition to having this

21    paragraph be subject to Section 506(b), I also want language

22    that it's in accordance with the terms of the DIP credit

23    agreement or the prepetition credit documents.  This -- I

24    don't want this indemnification provision to be a standalone.

25    The Debtors are indemnifying them in accordance with the terms

1  of the DIP credit agreement or the terms of the prepetition

2  credit document.

3         THE COURT:  As applicable.

4         MR. NEIER:  Yes, but this is an important section

5  for the lenders, especially the DIP lender, which is to be

6  indemnified for any lawsuits against the DIP lender, and so

7  it's an important section to recognize the fact that the DIP

8  lender is being indemnified, otherwise, it's not going to be a

9  DIP loan.

10        THE COURT:  You're -- say it again, Mr. Collins

11 because you included the DIP credit agreement in there.

12        MR. COLLINS:  My concern is not so much about the

13 DIP credit agreement.  My guess is the DIP credit agreement

14 has a very fulsome indemnification provision.  My primary

15 concern is with respect to the prepetition agents and the

16 prepetition lenders of somehow indemnifying them beyond what

17 is in their prepetition credit documents.  There is no

18 reference to the underlying credit documents, which I think

19 there should be.

20        MR. NEIER:  We'll make a reference and it's fine.

21 We have fulsome indemnification provisions in our prepetition

22 --

23        THE COURT:  Okay.

24        MR. NEIER:  -- loan agreements as well.

25        THE COURT:  All right.

1          MR. COLLINS:  Your Honor, the next change I have is

2   my paragraph 42 -- I'm sorry, page 42, and it's in

3   subparagraph 3, Your Honor.  The paragraph begins, "Subject to

4   the entry of the final order," 3(i).

5          THE COURT:  There are a couple of those floating

6   around.  "Give the Debtors any notice or take any other

7   action."  Is that the -- what paragraph are you in?

8          MR. NEIER:  I think I know what he wants.  Where it

9   says, "charge and collect interest," he wants the provision

10  that says, "including the default rate," to the extent

11  "authorized herein" stricken.  Is that what you want?

12         MR. COLLINS:  It's actually this, where it says the

13  committee --

14         MR. NEIER:  I just went over that.

15         MR. COLLINS:  You did?  I didn't hear you say that.

16         MR. NEIER:  I did.

17         MR. COLLINS:  Okay.

18         MR. NEIER:  I just confirmed it because the U.S.

19  Trustee asked me to confirm it --

20         MR. COLLINS:  Okay.

21         MR. NEIER:  -- that the committee is not locked up.

22  They can object to a sale on any grounds.

23         THE COURT:  Oh.  Right.

24         MR. COLLINS:  Good.

25         THE COURT:  Okay.

1      MR. COLLINS:  He confirmed that, Your Honor.

2      THE COURT:  All right.

3      MR. COLLINS:  And, finally, just the last change

4 that Mr. Neier was talking about in paragraph b on page 43 or

5 around page 42, 43.  I have a different order, Your Honor, I

6 was given prior to the hearing --

7      THE COURT:  Hang on.

8      MR. COLLINS:  There is a parenthetical in there that

9 says, "including at the default rate of interest."

10      MR. NEIER:  Yeah, we'll take that out.

11      MR. COLLINS:  And Mr. Neier agreed to take that out.

12      THE COURT:  Okay.

13      MR. COLLINS:  Thank you.

14      MR. NEIER:  Hold on a second.  Hold on a second.

15      MR. COLLINS:  Your Honor, that parenthetical

16 regarding the ability to charge default rate of interest is in

17 two locations in the order and I believe it's going to be

18 taken out of both places.

19      THE COURT:  You're going to take it out of both

20 locations, Mr. Neier?  Mr. Neier?  Mr. Neier?  Take it out of

21 --

22      MR. NEIER:  We're looking for it.  We're looking for

23 it.

24      MR. COLLINS:  The other location, Your Honor, I

25 think is --

1    THE COURT:  Well, I don't -- if you agree to take it

2    out, I don't particularly care where it is.

3    MR. NEIER:  Let's just be clear.  We're agreeing to

4    take out the sentence that says, "to charge default rate of

5    interest," but the loan agreements that exist prepetition are

6    what they are and the interest charged under them is what it

7    is and they're in default.  So, just to be clear.

8    THE COURT:  Mr. Collins?

9    MR. COLLINS:  Your Honor, it was not my

10   understanding that the prepetition lenders are being paid

11   default rate of interest going forward.

12   MR. NEIER:  They are.

13   MR. COLLINS:  They are?

14   MR. NEIER:  They're in default.

15   MR. COLLINS:  We'll reserve that issue for the final

16   hearing, Your Honor, as to whether that's appropriate.

17   THE COURT:  Anything else on the DIP?  All right.

18   Let me turn it and see if all my comments have been -- Mr.

19   Collins knows where all the tricks are.

20   MR. GALARDI:  We can't wait to use it against him

21   next time; right, Your Honor?  That's exactly true.

22   THE COURT:  All right.  I have no further comments

23   on the DIP.

24   MR. GALARDI:  Your Honor, I guess there's two

25   things.

1          THE COURT:  We need a hearing date.

2          MR. GALARDI:  Yes.  Your Honor, the week of April

3   13th would probably make sense if Your Honor is available.

4   That's

5   -- and it could slip to the 20th or 21st but maybe the 22nd but I

6   don't know what Your Honor's availability is.

7          THE COURT:  Well, I can do Tuesday afternoon.  I can

8   do Wednesday afternoon.  So the 14th or 15th.  Thursday is no

9   good.  Friday is probably not great.

10          MR. GALARDI:  15th.  What does it look like?  Tax

11   day.  Tax day, April 15th, Your Honor?

12          THE COURT:  Yes.

13          MR. GALARDI:  Why don't we try April 15th.  That's a

14   little over two weeks.  Objection deadline April 8th, week

15   before, or do you want it shorter?

16          THE COURT:  That's a little tight.

17          MR. GALARDI:  10th, Friday before?

18          THE COURT:  Is that Passover?  Yeah.  Okay.  You're

19   better of with -- let's make it -- tell you what.  Let's keep

20   it the 8th.

21          MR. GALARDI:  Okay.  Yeah.  Objections, the 8th.

22          THE COURT:  To the 8th but the hearing will be 3

23   o'clock --

24          MR. GALARDI:  So that's 15th.

25          THE COURT:  -- on the 15th.

1          MR. GALARDI:  Your Honor, I guess I have one another

2   -- I probably just put myself in -- if I file the 21st, 7, 14 -

3   -

4          THE COURT:  Is that too fast?

5          MR. GALARDI:  -- 21 -- not for the DIP.  21, 28th.

6   That still works for the 30 days on the utilities.  I just

7   wanted to double check that I should use that date.

8          THE COURT:  I can give you another hearing if --

9          MR. GALARDI:  It's up to you, Your Honor.  I mean,

10  that's -- that would be the final DIP.  If you wanted to give

11  us a hearing, another hearing, right around that same day, or

12  split up the two days, it's up to Your Honor.

13         THE COURT:  You let me know.

14         MR. GALARDI:  Let's just do the 15th, all of it;

15  right?  That's 15 days in this month, 24.  We're still fine.

16         THE COURT:  April 15th, 3 p.m.

17         MR. GALARDI:  Utilities will have a problem with

18  that.  21.  So that's 28, 7, 14, 28.  Let's use that.  Your

19  Honor, if we use the 15th for the utilities, is it all right

20  with Your Honor if I give them till the 10th of April or the

21  13th of April to make the adequate assurance request?

22         THE COURT:  I gave you to the 13th.  I don't like to

23  jam people up on Passover.

24         MR. GALARDI:  That's fine.  And on the premium

25  financing, we'll put that on there.  Is it okay on the 8th?  I

1    doubt there'll be objections but that was one of the other

2    interim orders that needed, I think, an objection date, not a

3    hearing date.

4            THE COURT:  Where am I in the utility order here?

5    Termination hearing will be 15th at 3, 6(e).

6            MR. GALARDI:  Say that again?

7            THE COURT:  Paragraph 6(e) of the utility order.

8    What date am I putting in there?

9            MR. GALARDI:  Yes.  I think the hearing would be --

10   you said the 13th for the date by which they have to give us

11   the request.

12           THE COURT:  Will be the 15th.

13           MR. GALARDI:  And the hearing would be the 15th.  And

14   that works out to 2, 3 --

15           THE COURT:  Where's the date --

16           MR. GALARDI:  I thought there was something in the

17   utility order.  It is on page 6 of the order in a single space

18   on the right side.  That's the hearing date.

19           THE COURT:  Yeah, but where's the request date?

20           MR. GALARDI:  Your Honor, in paragraph, the prior

21   page C, it says, "no less than five business days."  So we'll

22   just say, "no less than two business days," which will get us

23   to the 13th.

24           THE COURT:  Okay.

25           MR. GALARDI:  Or we can just write it to make it the

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1  April 13ᵗʰ date so people don't have to even do the

2  calculation.

3          THE COURT:  I already wrote in "two" --

4          MR. GALARDI:  Okay.

5          THE COURT:  Okay.  I'll get a -- oh --

6          MR. GALARDI:  Your Honor, there's a 345(b).  Did you

7  get that?  The date on that 345(b)?

8          THE COURT:  I did.  Where are we on the Gordon --

9          MR. GALARDI:  On the order?

10          THE COURT:  Yeah.

11          MR. GALARDI:  So you have all the dates in all of

12  those orders; right?

13          THE COURT:  Yes.

14          MR. GALARDI:  Okay.  With respect to the DIP order,

15  Your Honor, I think what we will do is we'll go revise, put in

16  the comments tonight, send it over to Your Honor first thing

17  in the morning and hopefully it will be entered, because our

18  borrowing is mountain time anyway, and I think that'll work as

19  long as it's entered by 10 a.m., if that schedule works for

20  Your Honor, and have it to Your Honor first thing in the

21  morning delivered to chambers.

22          THE COURT:  That's fine.  What about the Gordon

23  Brothers retail order?  Where are we on that?

24          MR. GALARDI:  I think we're done with that order.  I

25  don't think there are other changes to that order, Your Honor.

1   The one that we gave Your Honor with the black-line had all of

2   the changes from the AGs office.

3           THE COURT:  I haven't gone through the black-line

4   yet.  All right.  I've got you.

5           MR. GALARDI:  Your Honor --

6           THE COURT:  We'll use April 15th for that too,

7   paragraph 6?

8           MR. GALARDI:  That's fine, Your Honor.  It's in

9   there.  I'm sorry.  Yes.  Paragraph 6 of the order has the

10  date.  And what do we do with the objection -- objections

11  timely filed -- and that's ten days from the entry of the

12  order.

13          THE COURT:  I'm going to put April 8th in there.

14          MR. GALARDI:  Okay.  That's fine, Your Honor.

15          THE COURT:  I like this "latent defect" language.

16          MR. GALARDI:  You like it?

17          THE COURT:  Yeah.  I don't think I've seen it

18  before.  Have I seen it before?

19          MR. GALARDI:  You're not Ritz Camera; right?

20          THE COURT:  No.

21          MR. GALARDI:  I think the first time I saw it was

22  Ritz Camera.  It probably has some other origins but that's

23  out of the Boater's World, Ritz Camera language that was

24  negotiated with the AG.

25          THE COURT:  Okay.

Perfect Pages Transcription & Reporting, Inc.
(609) 654-8880

1    MR. GALARDI:  Is that Judge Gross?  I think that's

2  Judge Gross; right?

3    THE COURT:  Anyone wish to be heard?  I'll approve

4  the order as modified.

5    MR. GALARDI:  Thank you.

6    THE COURT:  Anything further for today?

7    MR. GALARDI:  No, Your Honor.  Thank you again.

8  Sorry to interrupt your Saturday and Sunday with reading but

9  appreciate the accommodation for a Monday hearing.

10    THE COURT:  My pleasure.  Hearing adjourned.

11    MR. GALARDI:  Thank you.

12    (Court adjourned at 4:46 p.m.)

13                    CERTIFICATE

14    I certify that the foregoing is a correct transcript

15  from the electronic sound recording of the proceedings in the

16  above-entitled matter.

17

18   /s/April J. Foga                    April 2, 2009
    April J. Foga, CET, CCR, CRCR
19

20

21

22

23

24

25