IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>SPORTSMAN'S WAREHOUSE, INC., *et al.*,<br>Debtors. | Chapter 11<br>Case No. 09-10990 (CSS)<br>Jointly Administered<br>Hearing Date: 4/15/09 at 3:00 pm<br>**Related Docket Nos. 15 and 49** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 4001 (I) AUTHORIZING DEBTORS (A) TO OBTAIN POSTPETITION FINANCING AND (B) TO UTILIZE CASH COLLATERAL;(II) GRANTING ADEQUATE PROTECTION; AND (III) SCHEDULING INTERIM AND FINAL HEARINGS

The Official Committee of Unsecured Creditors (the "Committee") appointed in the Chapter 11 cases of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its proposed counsel, hereby submits this Objection to the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Federal Rules of Bankruptcy Procedure 4001 (I) Authorizing Debtors (A) to Obtain Postpetition Financing and (B) Utilize Cash Collateral; (II) Granting Adequate Protection; and (III) Scheduling Interim and Final Hearings* dated March 21, 2009 [Docket No. 15] (the "Financing Motion").[1] In support of its Objection, the Committee respectfully states as follows.

### I. PRELIMINARY STATEMENT

1. By the Financing Motion, the Debtors seek approval to, among other things: (i) "roll-up" $33.5 million of alleged pre-petition secured debt into secured post-petition debt; (ii)

---

1 A hearing on first day motions was held before the Court on March 23, 2009, prior to the empanelling of the Committee. References to the pages of the transcript of the hearing are made as "Tr. at ____."

enhance the alleged pre-petition, secured lien and collateral positions of the Debtors' pre-petition lenders, General Electric Capital Corporation ("GECC"), as Agent, and the lender parties thereto (collectively the "Lenders") and GB Merchant Partners, LLC ("GB Merchant"; GB Merchant, GECC and the Lenders are hereinafter collectively referred to as the "Pre-Petition Lenders") by granting them secured, superpriority, priority and/or administrative claims in collateral previously unencumbered by the Pre-Petition Lenders; (iii) strip the Debtors' estates of any and all previously unencumbered assets including real property, leases, bankruptcy claims and causes of action, (iv) saddle the Debtors' estates with exorbitant closing fees, costs, indemnity reserves and lender professional fees in exchange for only minimal financing over an extremely short period of time; and (v) establish an expedited timeline for the sale, disposition and/or restructuring of the Debtors' assets and business operations, which may not be achievable and could result in a forced liquidation of the Debtors.

2. Beyond the extraordinary costs of the proposed financing and use of cash collateral (collectively the "DIP Financing") -- in excess of $2.25 million including fees, expenses and attorney's fees -- the Committee remains concerned with approval of a financing arrangement that establishes unrealistic timelines that may or may not be attainable, which may foreclose the Debtors' (and Committee's) goal of developing and implementing a successful plan of reorganization, and which may leave the Debtors' estates in a far worse position than if other restructuring or liquidation alternatives were pursued in these cases. In short, the Committee is willing to support a DIP Financing Facility that adequately protects the Pre-Petition Lenders' interest in their pre-petition collateral while reasonably safeguarding the interest of unsecured creditors and providing the Debtors with sufficient liquidity to implement their business plan. The Committee cannot, and will not, agree to the proposed DIP Financing unless it is modified to provide the Debtors with the additional time and liquidity necessary to develop and implement a

consensual strategy for the administration of these estates and the successful implementation of a plan of reorganization.

## II. JURISDICTION

3. This Court has jurisdiction to consider the Financing Motion and this Objection, pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b). Venue of these cases, the Financing Motion and this Objection in this district is proper under 28 U.S.C. § 1408.

## III. BACKGROUND

### A. The Debtors' Cases

4. On March 21, 2009 (the "Petition Date"), Sportsman's Warehouse Holdings, Inc. ("SW Holdings") and its five direct and indirect subsidiaries (the "Subsidiary Debtors" and, together with SW Holdings, the "Debtors") commenced these cases by filing voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue in the possession of their properties and management of their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

### B. The Interim Order

5. On March 24, 2009, this Court entered that *Interim Financing Order (I) Authorizing the Debtors to Incur Post-Petition Indebtedness with Administrative Superpriority and Secured by Senior Liens on Substantially All Assets Pursuant to Section 364(c) and (d) of the Bankruptcy Code, (II) Granting Use of Cash Collateral, (III) Granting Adequate Protection; (IV) Granting Other Related Relief, and (V) Scheduling a Final Hearing* [Docket No. 49] (the "Interim Order").

C.  **The Committee**

6. On April 2, 2009, the United States Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code. The Committee met, organized and selected Greenberg Traurig, LLP ("Greenberg") as its counsel, and Deloitte Financial Advisory Services LLP ("Deloitte") as its financial advisor. Applications for the Committee's retention of Greenberg and Deloitte will be filed shortly.

D.  **Pre-Petition Capital Structure**

7. On October 31, 2007, the Subsidiary Debtors entered into a loan agreement, guaranteed by SW Holdings, that provided for a revolving credit facility with various lenders, with GECC as agent (as amended, the "GECC Revolving Credit Facility"). The GECC Revolving Credit Facility is secured by a first priority lien on and security interest in substantially all of the assets of the Debtors other than land, real estate, furniture, fixtures and equipment (the "Pre-Petition Collateral"). As of the Petition Date, the amount outstanding under the GECC Revolving Credit Facility was approximately $33.5 million.

8. On January 11, 2008, the Subsidiary Debtors entered into a term loan and security agreement (the "GB Term Loan Agreement" and, together with the GECC Revolving Credit Facility, the "Pre-Petition Loan Agreements"), guaranteed by SW Holdings, pursuant to which various lenders, with GB Merchant Partners, LLC ("GB Merchant") as agent, provided a term loan in the principal amount of $20 million. The obligations under the GB Term Loan Agreement are secured by a second priority lien on and security interest in the same collateral securing the GECC Revolving Credit Facility. As of the Petition Date, the principal amount outstanding under the GB Term Loan Agreement was approximately $16 million.

9. Prior to that Petition Date, the Debtors entered into that certain Intercreditor Agreement by and between GECC and GB Merchant, dated as of January 11, 2008, which governs

the relative rights and priorities of the agents, lenders, claims and liens under the Pre-Petition Loan Agreements.

## IV. COMMITTEE OBJECTIONS

10. The Committee has general objections to the DIP Financing that are set forth herein. The Committee also objects to certain specific provisions of the Interim Order (and to any final order to the extent such provisions are to be included therein)[2] and the DIP Financing set forth on Exhibit "A" attached hereto.

## V. ARGUMENT AND AUTHORITIES

11. While approval of the proposed DIP Financing remains within the Court's "informed discretion," the Court must balance the interest of the Debtors and their creditors. That balance requires the Debtors to demonstrate that the proposed financing comports with basic notions of fairness and equity and that it would ultimately inure to the benefit of these estates. *In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *Ames*, 115 B.R. at, 37-40. To be sure, the Debtors bear the burden to prove that the terms of the proposed financing are fair and reasonable and in the best interests of the estates and creditors. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). The onerous terms, releases, restrictions and fees included in the proposed DIP Financing are grossly unfair and burdensome to the Debtors and their estates, and consequently, the DIP Financing should not be approved in its present form.

12. A financing arrangement may not be so favorable to the lender so as to cause Code protections to serve only that lender, contrary to the intent of Congress. *See Mid-State Raceway, Inc. v. Mid-State Development Corp. (In re Mid-State Raceway, Inc.)*, 323 B.R. 40, 59 (Bankr.

---

2     The Committee understands that the Debtor intends to seek entry of a Final Order containing substantially the same provisions as the Interim Order entered by this Court on March 24, 2009. Thus, while the Committee has not yet been provided with a draft of a proposed Final Order, the objections contained herein are applicable to any Final Order as well.

N.D.N.Y. 2005) ("bankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the post-petition lender"), citing *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (Bankr 9th Cir. 1992); *Tenney Village*, 104 B.R. at 568 (characterizing the proposed financing facility as one that would "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt"); *In re Roblin Industries, Inc.*, 52 B.R. 241, 243 (Bankr. W.D.N.Y. 1985) (denying approval of proposed debtor in possession financing where, as a condition to extending the loan, the debtors were required to waive avoidance actions against the lenders in violation of their fiduciary duties).

13. The concept that bankruptcy is designed to create benefits for the *unsecured* creditor is fundamental. Bankruptcy should not be used as an express foreclosure court – a tool for secured creditors to liquidate collateral at the expense of junior creditors.

> A court of bankruptcy should not assume charge of encumbered property and liquidate the liens on it, unless there are reasonable grounds for believing some advantage will accrue to the bankrupt's estate. If the validity of the liens is unquestioned, and their amount is such that there is probably no excess of value in the property, it should be surrendered to the lienholders or others entitled, unless some other reason appears for retaining control. A court of bankruptcy is not a court of general jurisdiction for the adjudication of controversies or the administration of assets in which the bankrupt's estate is in no wise interested. If, however, cognizance is taken, it should be assumed some benefit or advantage was expected to accrue to the general creditors, and if it results otherwise it is equitable to make the general estate bear the cost of the proceeding.

*In re Harralson*, 179 F. 490, 492 (8th Cir. 1910); *see also In re Silver*, 338 B.R. 277, 282 (Bankr. E.D. Va. 2004) (Chapter 7 Trustee's proposed sale denied because unsecured creditors would receive nothing or "next to nothing.").[3]

## A. The Committee Objects to Any Waiver of the Debtors' Right to Section 506(c) Claims

14. The Committee objects to the waiver of the Debtors' rights to recover the reasonable, necessary costs and expenses of preserving or disposing of property securing an allowed secured claim of the Pre-Petition Lenders to the extent that the Pre-Petition Lenders fail to include as part of the budget costs and expenses of administration of the Debtors' estates. Congress' intent in enacting section 506(c) was to ensure that the debtor-in-possession would be entitled to recover expenses from its secured lender to the extent that those expenses are necessarily and reasonably associated with preserving or disposing of the lender's collateral. *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Industries, Inc).*, 57 F.3d 321, 325-26 (3d Cir. 1995) (discussing the Congressional Record, 124 Cong.Rec. 32,398 (Sept. 28, 1978) (statement of Rep. Edwards). Section 506(c) is thus designed to prevent "a windfall to the secured creditor at the expense of the claimant." *Id.* (citations omitted).

15. By waiving its rights under Section 506(c), the Debtors are agreeing to pay for any and all expenses associated with the preservation and disposition of the Pre-Petition Lenders'

---

3   The concepts of non-bankruptcy, foreclosure, good faith in bankruptcy, and Section 554 abandonment come into play when there is no benefit to unsecured creditors. *See also, Barber v. Westbay (In re Integrated Agri, Inc.)*, 313 B.R. 419, 425 (Bankr. C.D. Ill. 2004). ("It is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors"); *In re FJD, Inc.*, 24 B.R. 138, 141 (Bankr. D. Nev. 1982) ("If virtually all the indebtedness runs to secured creditors, and there is no equity in the property which would benefit unsecured creditors, the invocation of Chapter 11 proceedings is an abuse of the Bankruptcy Court's jurisdiction"). *See also In re Feinstein Family P'ship*, 247 B.R. 502, 507 (Bankr. M.D. Fla. 2000) ("Clearly, the Code never contemplated that a Chapter 7 trustee should act as a liquidating agent for secured creditors who should liquidate their own collateral"); *In re HBA E., Inc.*, 87 B.R. 248, 260 (Bankr. E.D.N.Y. 1988) ("These Chapter 11 cases do not represent efforts pitched to a 'business reorganization' or to 'restructure a business's finances.' They are essentially a two-party civil lawsuit involving non-bankruptcy law brought in the bankruptcy court in the guise of being a reorganization of some sort under Chapter 11. Chapter 11 was never intended to be used as a fist in a two party bout. The Chapter is entitled reorganization and not litigation"); *In re W.J. Rewoldt Co.*, 22 B.R. 459 (Bankr. E.D. Mich. 1982) (upon request of unsecured creditors committee, court ordered debtor's Chapter 11 case converted to Chapter 7 case where, among other things, debtor incurred losses post-petition, failed to obtain new business and intended to liquidate and it was almost certain its business would terminate).

collateral. The waiver covers all expenses that the Debtors can show "that absent the costs expended, the property would yield less to the creditor than it does as a result of the expenditure." *Brookfield Prod. Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984). Such immunizing provisions have been found unenforceable on the basis that they "operate as a windfall to the secured creditor at the expense of the administrative claimants." *In re Lockwood Corp.*, 223 B.R. 170 (Bankr. 8th Cir. 1998).

16. The Supreme Court recently held that such waivers should never be lightly granted, nor may the management of a debtor-in-possession agree to such a waiver for any but the most compelling of reasons, because immunizing provisions such as these are binding on all the parties in interest. *Hartford Underwriters Ins. v. Union Planters Bank N.A.*, 530 U.S. 1, 12 (2000) (debtor's decision to waive rights under Section 506(c) must be made in a manner consistent with its obligations "to seek recovery under the section whenever his fiduciary duties so require"). Given the fact that the Debtors have not demonstrated any extraordinary circumstances justifying a 506(c) waiver, the Court should not permit such waiver.

B. **The Pre-Petition Lenders Should Not Be Granted Liens or Super-Priority Claims on Proceeds from Avoidance Actions**

17. The Interim Order inappropriately grants the Pre-Petition Lenders liens and security interests in avoidance actions under Chapter 5 of the Bankruptcy Code. The granting of liens on avoidance actions and/or the proceeds thereof is completely at odds with the unique purposes served by avoidance actions, because avoidance actions are distinct creatures of bankruptcy law designed to ensure equality of distribution among general unsecured creditors.

18. Numerous courts severely restrict a debtor in possession's ability to pledge avoidance actions as security for post-petition financing. *See Official Comm. of Unsecured Creditors v. Goold Electronics Corp. (In re Goold Electronics Corp.)*, 1993 WL 408366, *3-4

(N.D. Ill., Sept. 22, 1993) (vacating bankruptcy court order approving post-petition financing "to the extent that the order assigns to the bank a security interest in the debtor's preference actions"). This is because avoidance actions are not property of a debtor's estate. *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics, Corp.)*, 226 F.3d 237, 244 (3d Cir. 2000) (avoidance actions are not property of the estate, but are essentially rights held by the estate for the benefit of creditors); *In re Sweetwater*, 55 B.R. 724, 731 (D. Utah 1985), *rev'd on other grounds*, 884 F.2d 1323 (10th Cir. 1989) ("The avoiding powers are not 'property' but a statutorily created power to recover property").

19. Because of the unique nature of avoidance actions, courts have recognized that, at least with respect to proceeds recovered pursuant to Section 544(b) of the Bankruptcy Code, "empowering the trustee or debtor in possession to avoid a transaction by pursuing an individual creditor's cause of action is a method of forcing that creditor to share its valuable right with other unsecured creditors." *Cybergenics*, 226 F.3d at 244; *see also Buncher Co. v. Official Committee of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer").

20. Since the avoidance actions are not property of the Debtors' estates, there is no legal basis for this Court to grant the Pre-Petition Lenders a lien and security interest on the avoidance actions or the proceeds thereof. This is just another unfair manipulation of the negotiations by the Pre-Petition Lenders. Accordingly, the avoidance actions should be excluded from the collateral and reserved solely for the benefit of the Debtors' unsecured creditors.[4]

---

4   The Pre-Petition Lenders also should be required to waive any right to satisfaction of their potential super-priority claim under Sections 364(c)(1) and 507(b) of the Bankruptcy Code through proceeds derived from the avoidance actions, because granting the Pre-Petition Lenders a super-priority claim with respect to the avoidance actions has the same effect as approving liens on avoidance actions and their proceeds.

C.  **The Replacement Liens Granted to the Pre-Petition Lenders are Overbroad and Must be Limited to the Diminution in Value of the Collateral**

21.  The Interim Order is troublesome in that it grants unlimited replacement liens to the Pre-Petition Lenders. Pursuant to section 361(2) of the Bankruptcy Code, however, replacement liens granted as adequate protection for an entity's interest in property are appropriate only to the extent that a debtor's <u>use</u> of such property results in a decrease in value of such entity's interest in the property. See 11 U.S.C. § 361(2) (emphasis added). Here, the Pre-Petition Lenders are oversecured, and they have not offered a shred of proof of any actual or threatened diminution in the value of the Pre-Petition Collateral. Because the Pre-Petition Lenders have not established even a *prima facie* case for adequate protection, this Court should deny the requested adequate protection or at a minimum, any proposed final order should be clear that any replacement liens should be limited to such diminution in the value of the Pre-Petition Collateral from and after the Petition Date, if any, which may result from the Debtors' use of Cash Collateral.

D.  **The DIP Financing Fees Are Unreasonable And Should Not Be Approved**

22.  A court must review the terms of proposed post-petition financing to determine whether those terms are reasonable and beneficial to the Debtors' estates and creditors. *See Aqua Assocs.*, 123 B.R. at 195-96; *Ames*, 115 B.R. at 37. A court may not "rubber stamp" economic terms, lending its imprimatur to above-market fees and interest rates.

23.  While the Debtors did not file any fee letters with the Financing Motion, the Committee understands that GECC's fee for providing the DIP Financing is $1.5 million and GB Merchant's fee, presumably for consent to use of its Cash Collateral, is $750,000 (collectively, the "Financing Fees"). *See* Tr. at 41. The proposed fees taken as a whole are completely out-of-line given the fact that the Pre-Petition Lenders are vastly oversecured. Moreover, the compressed proposed timelines in these Cases (which the Committee believes are inappropriate) do not warrant

the windfall of such excessive fees for nominal investment and risk. Accordingly, the Court should not approve the DIP Financing fees.

E. **The Committee Must Be Afforded Adequate Time To Investigate the Pre-Petition Lenders' Role in the Debtors' Bankruptcy and the Extent and Validity of the Purported Security Interests of the Pre-Petition Lenders in the Pre-Petition Collateral**

24. The Interim Order improperly attempts to hinder any investigation by the Committee of the Pre-Petition Lenders. Pursuant to Sections 18 and 19 of the Interim Order, the Committee must initiate an adversary proceeding or any other type of proceeding against the Pre-Petition Lenders with respect to their claims or security interests within 60 days following the appointment of the Committee.

25. The Committee respectfully submits that a 120-day investigation period, that begins on the date that the Court enters an order approving the retention of the Committee's counsel, would be sufficient to investigate the validity, extent, perfection, priority or enforceability of the Pre-Petition Lenders' liens, provided that (a) the Pre-Petition Lenders provide counsel to the Committee with copies of all prepetition loan documents and evidence of perfection prior to the commencement of the investigation period, and (b) the final DIP Financing order provides the Committee with standing to commence an adversary proceeding or to file any other pleading with the Court asserting an objection or defense with respect to the purported liens of the Pre-Petition Lenders.

26. There is no justifiable reason to limit the statute of limitations for the Committee to investigate the roles and relationships of the Pre-Petition Lenders in the Debtors' bankruptcy. The investigation of the acts, conduct and operation of the Debtors' businesses and other matters relevant to this case are an essential part of the enumerated duties given to official committees pursuant to Section 1103(c)(2) of the Bankruptcy Code and should not be curtailed. In light of

these circumstances, equity requires that the Committee be provided with a full and fair opportunity to investigate the claims of the Pre-Petition Lenders. Accordingly, the Committee respectfully asks that the Court (a) disapprove those provisions curtailing the Committee's ability to investigate, and if necessary, commence actions against the Pre-Petition Lenders, and (b) grant the Committee standing to commence actions against the Pre-Petition Lenders on behalf of the estates.

F.   **The Timing of the Deadlines Established by the DIP Credit Agreement Are Impossible for the Debtors to Meet and Set the Debtors up for Failure**

27.   Under the terms of the Senior Secured Super-Priority Debtor In Possession Financing Agreement (the "DIP Credit Agreement"), the Debtors must:

> (a) assume the leases (other than those that they have determined to reject) at least two weeks prior to the Lease Assumption Reserve Commencement Date (as defined in the DIP Credit Agreement) or alternatively, the Debtors shall distribute informational packages to potentially interested parties for a Full Chain Liquidation (as defined in the DIP Credit Agreement) and enter into a stalking horse bid and obtained approval from the Court for sales procedures (DIP Credit Agreement § 6.23); and
>
> (b) by April 30, 2009 (within 40 days after the Petition Date) either (i) file a plan of reorganization and a disclosure statement, (ii) enter into a letter of intent with a going concern buyer or (iii) enter into a letter of intent with respect to the investment of additional capital in an amount not less than $20,000,000 (DIP Credit Agreement § 9.1(r)(xiii)); and
>
> (c) by May 30, 2009 (within 70 days after the Petition Date) obtain approval from this Court of a disclosure statement (DIP Credit Agreement § 9.1(r)(xiv)); and
>
> (d) by July 8, 2009 (within 109 days after the Petition Date) obtain an order confirming a plan of reorganization (*id.*); and
>
> (e) by July 19, 2009 (within 120 days after the Petition Date) consummate any such plan of reorganization) (*id.*); and
>
> (f) in the event that the Debtors have entered into one of the two letter of intent options referenced above, the Debtors have to enter into "definitive documentation" with respect to the transaction by May 30, 2009 and consummate the transaction by July 8, 2009 (DIP Credit Agreement § 9.1(r)(xv)).

28. The Debtors' failure to meet any of the deadlines set forth above constitutes an Event of Default under the DIP Credit Agreement. While the Committee has no objection to Cases that proceed at a fast pace, these deadlines provide the Committee with no ability to understand the business plan that the Debtors intend to implement in connection with any plan of reorganization and leave the Debtors with no margin for error. Failure to meet these accelerated deadlines could force the Debtors into the position of having to liquidate all of their assets, after paying the Pre-Petition Lenders their onerous fees. Surely, the Pre-Petition Lenders have no intention to force the precipitous liquidation of the Debtors in order to liquidate their collateral through these chapter 11 cases while shifting the cost of that liquidation to the unsecured creditors of the Debtors' estates.

## VI. CONCLUSION

WHEREFORE the Committee respectfully requests that the Court (a) deny approval of the DIP Financing in its current form and of the relief sought in the Financing Motion in accordance with the foregoing objections, and (b) grant the Committee such other and further relief as this Court deems just and proper.

Dated: April 10, 2009

GREENBERG TRAURIG, LLP

Scott D. Cousins (DE Bar No. 3079)
Donald J. Detweiler (DE Bar No. 3087)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 661-7000
Facsimile: (302) 661-7360

-and-

Jeffrey M. Wolf, Esq.
Greenberg Traurig, LLP
One International Place
Boston, MA 02110
(617) 310-6000

Fax: (617) 310-6001

Proposed Counsel to the Official Committee of Unsecured Creditors of Sportsman's Warehouse, Inc. *et al.*